NO. 12-03-00390-CV
 
IN THE COURT OF APPEALS

TWELFTH COURT OF APPEALS DISTRICT

TYLER, TEXAS
IN THE INTEREST OF                                     §               APPEAL FROM THE 307TH
 
§JUDICIAL DISTRICT COURT OF
 
R.D.H. AND L.N.A.                                             §               GREGG COUNTY, TEXAS
                                                                                                                                                             
MEMORANDUM OPINION
            Charlotte Anderson Fort and Robert F. Hall appeal the termination of their parental rights. In
two issues, Charlotte and Robert challenge the order of termination. We affirm.
 
Background
            Charlotte is the mother of L.N.A., born May 23, 2000. Charlotte and Robert are the parents
of R.D.H., born June 24, 2001. In July of 2002, a court order established the parent-child relationship
between Charlotte, Robert, and R.D.H. and included orders for child support and visitation by Robert.
In December 2002, Mona Nolen, a Texas Department of Protective and Regulatory Services (the
“Department”) investigator in Longview, Gregg County, Texas, investigated a complaint of physical
abuse against Charlotte. At the time of the complaint, Charlotte lived in a house with her mother, a
sister, brother, and two children, R.D.H. and L.N.A. Tyerell Hamilton, the boyfriend of Charlotte’s
sister, Marie Anderson, was also living in the house.
            According to the complaint, Charlotte took R.D.H. to Good Shepherd Hospital in Longview
on December 1. A medical examination revealed that R.D.H. was suffering from multiple physical
injuries, including bruises to his leg and stomach area, laceration of his liver, two broken ribs, and
bruises on the right side of his body. The same day, R.D.H. was airlifted to Children’s Hospital in
Dallas where emergency surgery was performed on him. On December 2, the Department filed an
original petition for protection of a child, for conservatorship, and for termination of the parent-child
relationships between Charlotte and L.N.A. and R.D.H. and between Robert and R.D.H. In an
affidavit attached to the petition, Nolen described R.D.H.’s injuries. According to Nolen’s affidavit,
various internal injuries were discovered during the emergency surgery, including trauma to R.D.H.’s
colon, trauma to the right renal area, adrenal contusion, a small liver laceration, and gastric contusion. 
At the time Nolen made the affidavit, R.D.H. was in the intensive care unit and in serious condition.
            As part of Nolen’s investigation, she interviewed Charlotte at Good Shepherd. Charlotte told
Nolen that, at approximately 11:15 p.m. the night before, she left her two children with her sister’s
boyfriend, Tyerell, while she went to meet Robert. She reported that, when she returned home about
3:00 a.m., the children were asleep. That morning, L.N.A. came to Charlotte’s room around 9:00 a.m.
without R.D.H. Charlotte found R.D.H. in bed. He was having difficulty breathing, and she noticed
that he had bruises. According to Nolen’s affidavit, Charlotte stated that she took the children to the
home of her sister, Denise Henderson, in order to get her sister to accompany her to the emergency
room. Nolen stated that Tyerell was interviewed by the Gladewater Police Department, denied
injuring the child, and reported previous incidents in which Charlotte physically abused R.D.H. 
Nolen’s investigation also revealed at least two previous reports of abuse or neglect naming Charlotte
as the perpetrator and an assault charge against Robert. In November of 2003, the termination
proceeding was tried before a jury. At trial, Nolen testified that, because of the severity of R.D.H.’s
injuries and Robert’s assault charge, the Department took custody of R.D.H. He was placed in a
therapeutic foster home and L.N.A. was ultimately placed with Charlotte’s aunt, Luvenia Beck Ford. 
            The jury found, by clear and convincing evidence, that Charlotte knowingly placed or
knowingly allowed L.N.A. and R.D.H. to remain in conditions or surroundings which endangered their
physical or emotional wellbeing, that Charlotte engaged in conduct or knowingly placed L.N.A. and
R.D.H. with persons who engaged in conduct which endangered their physical or emotional wellbeing,
and that termination of the parent-child relationship was in the best interest of L.N.A. and R.D.H. The
jury also found that the parent-child relationship between Charlotte and both her children, L.N.A. and
R.D.H., should be terminated. Further, the jury found, by clear and convincing evidence, that Robert
knowingly placed or knowingly allowed R.D.H. to remain in conditions or surroundings which
endangered his physical or emotional wellbeing, that Robert engaged in conduct or knowingly placed
R.D.H. with persons who engaged in conduct which endangered his physical or emotional wellbeing,
and that termination of the parent-child relationship was in the best interest of R.D.H. Finally, the jury
found that the parent-child relationship between Robert and R.D.H. should be terminated. The court
signed an order of termination incorporating the jury’s findings. This appeal followed.
 
Termination of Parental Rights
            Involuntary termination of parental rights embodies fundamental constitutional rights. Vela
v. Marywood, 17 S.W.3d 750, 759 (Tex. App.–Austin 2000), pet. denied per curiam, 53 S.W.3d 684
(Tex. 2001); In re J.J., 911 S.W.2d 437, 439 (Tex. App.–Texarkana 1995, writ denied). A
termination decree is “complete, final, irrevocable [and] divests for all time the parent and child of all
legal rights, privileges, duties, and powers with respect to each other except for the child’s right to
inherit.” Wiley v. Spratlan, 543 S.W.2d 349, 352 (Tex. 1976); In re Shaw, 966 S.W.2d 174, 179
(Tex. App.–El Paso 1998, no pet.). Thus, breaking the bonds between a parent and child “can never
be justified without the most solid and substantial reasons.” Wiley, 543 S.W.2d at 352. Because a
termination action “permanently sunders” those bonds, the proceedings must be strictly scrutinized. 
Id.; In re Shaw, 966 S.W.2d at 179. However, parental rights are not absolute, and it is vital that the
emotional and physical interests of the child not be sacrificed at the expense of preserving that right. 
In re C.H., 89 S.W.3d 17, 26 (Tex. 2002).
            Section 161.001 of the Texas Family Code permits a court to order termination of parental
rights if two elements are established. Tex. Fam. Code Ann. § 161.001 (Vernon 2002); In re J.M.T.,
39 S.W.3d 234, 237 (Tex. App.–Waco 1999, no pet.). First, the parent must have engaged in any one
of the acts or omissions itemized in the first subsection of the statute. Tex. Fam. Code Ann.
§ 161.001(1) (Vernon 2002); Green v. Texas Dep’t of Protective & Regulatory Servs., 25 S.W.3d
213, 219 (Tex. App.–El Paso 2000, no pet.); In re J.M.T., 39 S.W.3d at 237. Second, termination
must be in the best interest of the child. Tex. Fam. Code Ann. § 161.001(2) (Vernon 2002); In re
J.M.T., 39 S.W.3d at 237. Additionally, both elements must be established by clear and convincing
evidence, and proof of one element does not alleviate the petitioner’s burden of proving the other. Tex.
Fam. Code Ann. §161.001; Wiley, 543 S.W.2d at 351; In re J.M.T., 39 S.W.3d at 237. 
            Due process requires a petitioner to justify termination by clear and convincing evidence
because termination is such a drastic remedy. In re J.M.T., 39 S.W.3d at 237. The clear and
convincing standard for termination of parental rights is both constitutionally and statutorily mandated. 
Tex. Fam. Code Ann. § 161.001; In re J.J., 911 S.W.2d at 439. Clear and convincing evidence
means “the measure or degree of proof that will produce in the mind of the trier of fact a firm belief
or conviction as to the truth of the allegations sought to be established.” Tex. Fam. Code Ann.
§ 101.007 (Vernon 2002). There is a strong presumption that the best interest of the child is served
by preserving the parent-child relationship. Wiley, 543 S.W.2d at 352; In re J.M.T., 39 S.W.3d at
240. Thus, the burden of proof is upon the person seeking to deprive the parent of their parental rights. 
In re J.M.T., 39 S.W.3d at 240.
 
Standard of Review
            The appropriate standard for reviewing a factual sufficiency challenge to the termination
findings is whether the evidence is such that a fact finder could reasonably form a firm belief or
conviction about the truth of the petitioner’s allegations. In re C.H., 89 S.W.3d at 25. In determining
whether the fact finder has met this standard, an appellate court considers all the evidence in the
record, both that in support of and contrary to the trial court’s findings. Id. at 27-29. Further, an
appellate court should consider whether disputed evidence is such that a reasonable fact finder could
not have reconciled that disputed evidence in favor of its finding. In re J.F.C., 96 S.W.3d 256, 266
(Tex. 2002). If the disputed evidence is so significant that a fact finder could not reasonably have
formed a firm belief or conviction, then the evidence is factually insufficient. Id. An appellate court
should specify its reasons for concluding that a reasonable trier of fact could not have attributed
disputed evidence in favor of the finding. Id. at 266-67.
            This standard retains the deference an appellate court must have for the fact finder’s role. In
re C.H., 89 S.W.3d at 26. Additionally, the trier of fact is the exclusive judge of the credibility of the
witnesses and the weight to be given their testimony. Nordstrom v. Nordstrom, 965 S.W.2d 575, 580
(Tex. App.–Houston [1st Dist.] 1997, pet. denied). Thus, our review must not be so rigorous that only
fact findings established beyond a reasonable doubt could withstand review. In re C.H., 89 S.W.3d
at 26.
 
Termination Under Section 161.001(1)(D)
            In a subpart of her second issue, Charlotte contends that the evidence is factually insufficient
to support a finding that she knowingly placed or knowingly allowed the children to remain in
conditions or surroundings which endangered their physical or emotional wellbeing. In a subpart of
Robert’s second issue, he contends that the evidence is factually insufficient to support a finding that
he knowingly placed or knowingly allowed R.D.H. to remain in conditions or surroundings which
endangered his physical or emotional wellbeing. 
Applicable Law
            Section 161.001(1)(D) of the Texas Family Code states that the court may order termination
of the parent-child relationship if the court finds by clear and convincing evidence that the parent has
knowingly placed or knowingly allowed the child to remain in conditions or surroundings which
endanger the physical or emotional wellbeing of the child. Tex. Fam. Code Ann. §161.001(1)(D)
(Vernon 2002). This provision addresses the child’s surroundings and environment, rather than
parental conduct. In re N.R., 101 S.W.3d 771, 775-76 (Tex. App.–Texarkana 2003, no pet.); In re
R.D., 955 S.W.2d 364, 367-68 (Tex. App.–San Antonio 1997, pet. denied); Ybarra v. Texas Dep’t of
Human Svcs., 869 S.W.2d 574, 577 (Tex. App.–Corpus Christi 1993, no writ). 
            “Endanger” means to expose to loss or injury or to jeopardize. Texas Dep’t of Human Servs.
v. Boyd, 727 S.W.2d 531, 533 (Tex. 1987); In re D.M., 58 S.W.3d 801, 811 (Tex. App.–Fort Worth
2001, no pet.). Endanger means more than a threat of metaphysical injury or the possible ill effects
of a less-than-ideal family environment. Boyd, 727 S.W.2d at 533; In re D.M., 58 S.W.3d at 811. 
Nonetheless, it is not necessary that the conduct be directed at the child or that the child actually
suffers injury. Boyd, 727 S.W.2d at 533; In re J.J., 911 S.W.2d at 440. Rather, it is sufficient that
the child’s wellbeing be jeopardized or exposed to loss or injury. In re J.J., 911 S.W.2d at 440.
            When seeking termination, the Department must show that the child’s living conditions pose
a real threat of injury or harm. In re N.R., 101 S.W.3d at 776; Ybarra, 869 S.W.2d at 577. Further,
there must be a connection between the conditions and the resulting danger to the child’s emotional
or physical wellbeing. Ybarra, 869 S.W.2d at 577-78. However, it is not necessary for the parent to
have certain knowledge that an actual injury is occurring. In re N.R., 101 S.W.3d at 776. It is
sufficient that the parent was aware of the potential for danger to the child in such environment and
disregarded that risk. Id. The relevant time frame to determine whether there is clear and convincing
evidence of endangerment is before the child was removed. Ybarra, 869 S.W.2d at 577.
            Abusive or violent conduct by a parent or other resident of a child’s home can produce an
environment that endangers the physical or emotional wellbeing of a child. D.O. v. Texas Dep’t of
Human Svcs., 851 S.W.2d 351, 354 (Tex. App.–Austin 1993, no writ); In re B.R., 822 S.W.2d 103,
106 (Tex. App.–Tyler 1991, writ denied). We have previously concluded that it is illogical to reason
that inappropriate, debauching, unlawful, or unnatural conduct of persons who live in the home of a
child, or with whom a child is compelled to associate on a regular basis in his home, are not inherently
a part of the “conditions and surroundings” of that place or home. In re B.R., 822 S.W.2d at 106. 
This statute is designed to protect a child from precisely such an environment. Id. Further, an
environment that routinely subjects a child to the probability that he will be left alone because his
parents are once again jailed endangers both the physical and emotional wellbeing of a child. In re
S.D., 980 S.W.2d 758, 763 (Tex. App.–San Antonio 1998, pet. denied). Conduct that results in such
a disability, and that subjects a child to a life of uncertainty and instability, endangers the child’s
physical or emotional wellbeing. Id.
Analysis for Charlotte
            At trial, Charlotte admitted smoking marijuana with Tyerell and smoking marijuana about once
or twice a week before the incident. Charlotte admitted that Marie smoked marijuana with Tyerell and
that Marie provided her with marijuana. In his deposition, Tyerell admitted that he and Charlotte
smoked marijuana on a daily basis with the children present in the living room. In fact, Tyerell stated
that Charlotte gave him marijuana to babysit her children. In the past year, Charlotte left her children
with her mother, her two sisters, and Tyerell.
            Charlotte was charged with assault-family violence after she and Robert had a fight on
February 23, 2002. Charlotte acknowledged pulling a gun on Robert while her children were in the
house asleep. She told the police that Robert had been “pushing [her] around” and he was arrested.
Charlotte also testified that, six or seven months after R.D.H.’s hospitalization, she and Robert got
back together and that they are currently living together. Charlotte testified that her relationship with
Robert was not abusive, but that they had a lot of arguments. 
            Virginia Hunt, a conservatorship supervisor with the Department, is responsible for evaluating
cases and supervising the workers. Hunt concluded that both children were inadequately supervised
and L.N.A. had been inadequately cared for by Charlotte. According to Hunt, the Department had
previously investigated Charlotte on more than one occasion. In those investigations, the Department
offered physical supplies, including diapers and clothing for the children, because they had none. 
Behaviors were present in Charlotte’s home that exposed the children to danger, including marijuana
smoking in front of the children. Further, Charlotte chose to leave her children in the home with a
caregiver who smoked marijuana. Regarding the assault case, Hunt testified that there are either two
victims or two perpetrators, depending upon the real story. Both parents seemed to promote violence
and at least one of them had a criminal history.
            Nolen testified that there were three past reports of abuse by Charlotte. The first two, in
February of 2002, were physical neglect reports alleging that L.N.A. was not being properly cared for
or, more specifically, being left in her diapers for long periods of time. Both cases were “ruled out.” 
The third, made on October 21, 2002, was a report of neglectful supervision alleging that Charlotte
fought or argued with a friend, that the children were present, and that L.N.A. sustained an injury to
her face. Charlotte could not be located and the case was closed as “family moved.” 
            Dr. Donald Winstead, a licensed psychologist who performed psychological assessments of
Charlotte and Robert, was aware that Charlotte and Robert’s relationship had been violent at times. 
Robert Hall, Sr., Robert’s father, was at Charlotte’s house almost every day. Hall did not observe any
body bruises on R.D.H. However, Hall testified that he was concerned when he observed a scar on
R.D.H.’s forehead prior to the December 2002 incident. When Hall asked what occurred, Charlotte
told him that R.D.H. played rough. Hall also testified that both children were, at times, dirty and
smelled bad. Further, Hall stated that one time he saw the children outside without proper clothing.
            According to Charlotte’s aunt, Luvenia, in December of 2000, Charlotte left L.N.A. with
another aunt, Carol Smith. However, before Charlotte took L.N.A. to Carol’s house, she went to
Luvenia’s house for diapers because she did not have any for L.N.A. Luvenia testified that, at that
time, L.N.A. was very small and not clean, her hair was not combed or in plaits, and she was very cold
and “ashy-looking.” According to Luvenia, L.N.A. stayed with Carol until February of 2001. 
            Although there is conflicting testimony regarding the assault charge, that Charlotte’s
relationship with Robert was not abusive, and that R.D.H. did not have any body bruises before the
December 2002 incident, the jury could have resolved this conflict in favor of its finding. The jury
could have found that Charlotte’s smoking marijuana with Tyerell, leaving her children with a person
who smoked marijuana, inadequately supervising both children, inadequately caring for L.N.A., not
obtaining physical supplies, including diapers and clothing, for both children, and remaining in a
violent and abusive relationship with Robert were conditions that endangered the children’s physical
or emotional wellbeing. Although there is some disputed evidence, this evidence is not so significant
that a reasonable trier of fact could not have reconciled the evidence in favor of its finding and formed
a firm belief or conviction that Charlotte knowingly placed or knowingly allowed her children to
remain in conditions or surroundings which endangered their physical or emotional wellbeing.
Accordingly, this subpart of Charlotte’s second issue is overruled.
Analysis for Robert
            In addition to the evidence previously described, Robert admitted, at trial, making statements
that the children smelled bad, that they were without a coat while outside in cold weather, and that
someone hit L.N.A. in the face because Robert was worried about R.D.H. Robert admitted that he
and Charlotte got into arguments and that Charlotte had a bad temper, but said that she was changing. 
According to Charlotte, she and Robert had a fight on February 23, 2002, and she acknowledged
pulling a gun on Robert with R.D.H. in the house asleep. Robert’s father, Hall, testified that he did
not observe any body bruises on R.D.H. but acknowledged that both children were, at times, dirty and
smelled bad and that one time he saw the children outside without proper clothing.
            Hunt stated that R.D.H. was unable to protect himself and that he was inadequately supervised. 
Hunt also testified that behaviors were present in Charlotte’s home that exposed R.D.H. to danger,
including marijuana smoking in front of the child. Further, she testified that both Robert and Charlotte
seemed to promote violence and at least one of them had a criminal history. Winstead was aware that
Charlotte and Robert’s relationship had been violent at times. According to Angela Weathers, a
conservatorship worker with the Department, Robert stated that Charlotte was not caring for the
children. However, to Weathers’s knowledge, Robert did nothing to remove R.D.H. from Charlotte
prior to the Department’s becoming involved. Further, Weathers concluded that Robert’s violent
behaviors endangered his child. 
            Although there is conflicting testimony regarding the assault charge discussed in the preceding
subsection, that Robert’s relationship with Charlotte was not abusive, and that R.D.H. did not have
any body bruises before the incident, the jury could have resolved this conflict in favor of its finding. 
The jury could have found that Robert’s violent behavior and his disregarding the risk despite his
knowledge and concern that R.D.H. was being improperly cared for were conditions that endangered
R.D.H.’s physical or emotional wellbeing. Although there is some disputed evidence, this evidence
is not so significant that a reasonable trier of fact could not have reconciled the evidence in favor of
its finding and formed a firm belief or conviction that Robert knowingly placed or knowingly allowed
R.D.H. to remain in conditions or surroundings which endangered his physical or emotional wellbeing. 
Accordingly, this subpart of Robert’s second issue is overruled.
 
Termination Under Section 161.001(1)(E)
            As part of her second issue, Charlotte contends that the evidence is factually insufficient to
support a finding that she engaged in conduct or knowingly placed the children with persons who
engaged in conduct that endangered their physical or emotional wellbeing. Charlotte denied injuring
R.D.H. and argued that Tyerell caused R.D.H.’s injuries. Robert contends, as part of his second issue,
that the evidence is factually insufficient to support a finding that he engaged in conduct or knowingly
placed the R.D.H. with persons who engaged in conduct that endangered his physical or emotional
wellbeing. Robert argues that there is no evidence that he caused R.D.H.’s injuries or was negligent
in allowing the child to remain with Charlotte. Further, Robert contends that there is no evidence that
he was made aware of any problems or of Tyerell’s past history.
Applicable Law
            Section 161.001(1)(E) of the Texas Family Code states that the court may order termination
of the parent-child relationship if the court finds by clear and convincing evidence that the parent has
engaged in conduct or knowingly placed the child with persons who engaged in conduct which
endangers the physical or emotional wellbeing of the child. Tex. Fam. Code Ann. § 161.001(1)(E)
(Vernon 2002). The specific danger to the child’s wellbeing need not be established as an independent
proposition, but may instead be inferred from parental misconduct. Boyd, 727 S.W.2d at 533; In re
J.J., 911 S.W.2d at 440. Further, scienter is not required for an appellant’s own acts under section
161.001(1)(E), although it is required when a parent places his child with others who engage in
endangering acts. In re U.P., 105 S.W.3d 222, 236 (Tex. App.–Houston [14th Dist.] 2003, pet.
denied). Finally, the need for permanence is a paramount consideration for the child’s present and
future physical and emotional needs. In re N.K., 99 S.W.3d 295, 301 n.9 (Tex. App.–Texarkana 2003,
no pet.); In re M.D.S., 1 S.W.3d 190, 200 (Tex. App.–Amarillo 1999, no pet.).
            As previously discussed, “endanger” means to expose to loss or injury or to jeopardize. Boyd,
727 S.W.2d at 533; In re D.M., 58 S.W.3d at 811. It is not necessary that the conduct be directed at
the child or that the child actually suffers injury; rather, it is sufficient that the child’s wellbeing be
jeopardized or exposed to loss or injury. Boyd, 727 S.W.2d at 533; In re J.J., 911 S.W.2d at 440.
            Subsection (E) requires us to look at the parent’s conduct alone, including actions, omissions,
or the parent’s failure to act. In re D.J., 100 S.W.3d 658, 662 (Tex. App.–Dallas 2003, pet. denied);
In re D.M., 58 S.W.3d at 811. It is inconsequential that the parental conduct occurred before the
child’s birth. In re U.P., 105 S.W.3d at 229; In re D.M., 58 S.W.3d at 812. Instead, courts look to
what the parent did both before and after the child’s birth to determine whether termination is
necessary. In re D.M., 58 S.W.3d at 812. Further, termination under subsection (E) must be based
on more than a single act or omission. Id.; In re D.T., 34 S.W.3d 625, 634 (Tex. App.–Fort Worth
2000, pet. denied). A voluntary, deliberate, and conscious “course of conduct” by the parent that
endangers the child’s physical and emotional wellbeing is required. In re D.M., 58 S.W.3d at 812;
In re D.T., 34 S.W.3d at 634.
Analysis for Charlotte
            In addition to the evidence previously described, Charlotte testified, at trial, that, at
Thanksgiving, she noticed bruising around R.D.H.’s waist, but believed it was fingertip bruising
because she frequently picked him up. Charlotte acknowledged that R.D.H. had a “little scruff” on
his face from sliding across a wood floor. She also gave an account of the events of November 30 and
December 1 that was similar to her earlier statement to Nolen. However, Charlotte also testified that,
on November 30, she bathed R.D.H. around 5:00 or 6:00 p.m and, at that time, she did not observe any
marks or bruises on him. Further, she said that, prior to leaving the house, she advised Robert that she
was leaving the child with Tyerell. According to Charlotte, Tyerell had watched R.D.H. previously
without incident. Charlotte testified that she woke up around 7:00 a.m. when L.N.A. came to her
room. When she checked on R.D.H., she found him lying in bed. His diaper was full as if he had
diarrhea. After changing his diaper, Charlotte observed that R.D.H. was not breathing well. Charlotte
immediately concluded that R.D.H. had been injured from someone’s intentional act because he had
bruises around his chest and rib cage area in the back. Charlotte paged Robert, but she did not call
911. She then traveled to Good Shepherd by herself, admittedly bypassing police stations and EMS
locations in Gladewater and White Oak.
            Charlotte testified that, while R.D.H. was being treated at Good Shepherd, she left the hospital
to pick up Robert at work. While she was gone, Charlotte did not know what was happening to
R.D.H. Later, Charlotte and Robert left the hospital for approximately one hour to deliver L.N.A. to
her aunt, Luvenia. At that time, the hospital was preparing to take R.D.H. to Dallas. Charlotte told
the Longview Police Department and the Department about her suspicion that Tyerell injured R.D.H.
            Darla Kay Florey, a registered nurse in the emergency department at Good Shepherd, testified
that she was on duty when R.D.H. arrived. R.D.H. was obtunded, or dulled, limp, and unresponsive,
and his breathing was shallow. Charlotte told Florey that R.D.H. had not been sick other than from
diarrhea, that he was left the night before with a babysitter while she was at work, and that he was in
this condition when she awoke that morning. According to Florey, R.D.H.’s eyes were closed. He also 
had abrasions with scabs on either side of his forehead, a swollen area or knots on his head, and
multiple small bruises or little marks on his body, including marks on his shins and lower legs. 
Further, Florey observed many darkened areas on the trunk of R.D.H.’s body and his head. 
            Florey testified that, about forty-five minutes after R.D.H.’s arrival, Charlotte left to pick up
the child’s father from work. At that time, R.D.H. was not stable. According to Florey, R.D.H.’s
father and his paternal grandparents arrived around 1:30 p.m. Around 3:00 p.m., while they were
discussing arrangements to transfer the child to Dallas, Charlotte left to make arrangements for her
other child and gather some belongings. She returned after 5:00 p.m. While R.D.H. was being treated,
the hospital discovered some injuries or problems and contacted the Department and the police. 
Eventually, R.D.H. was transported to Children’s Hospital in Dallas, Texas.
            Dr. Brian Mendenhall, an emergency physician at Good Shepherd, testified that he treated
R.D.H. on December 1, although he could not recall the specifics of the case. Mendenhall testified
that, according to his records, when R.D.H. arrived he was obtunded, or barely responsive, and his eyes
were open, but he was not crying or making much movement. R.D.H. had some broken ribs on the
right side, some chest wall and abdominal contusions or bruising throughout these areas, and an
apparent contusion of his liver. Mendenhall testified that R.D.H. had metabolic acidosis, or more acid
in his blood than normal, from the diarrhea or an unknown cause. In Mendenhall’s opinion, R.D.H.’s
injuries were caused by trauma, more specifically, blunt-force trauma to the chest and abdomen. 
Mendenhall did not recall if R.D.H.’s bruising formed a pattern. R.D.H. was subsequently transferred
to Children’s Hospital at his recommendation. 
            Officer Vance Callahan, a patrol officer with the Gladewater Police Department, was contacted
by the Longview Police Department on December 1 regarding an injury to a child. At Good Shepherd,
Callahan photographed R.D.H. According to Callahan, the photographs depicted a small black male
child with bruising on his right side about three to four inches beneath his armpit in the rib area, an
old wound healing above his left eyebrow, a large redness or bruising about four to five inches above
his pubic area, numerous red areas and/or bruises from the ankle to the knee on his right leg, and slight
swelling or a light bruise on the right side of his face. Callahan testified that R.D.H. had a square
pattern of markings on his ribs. In Callahan’s opinion, the soles of the light blue Nike Air tennis shoes,
size 8, seized from Charlotte’s home matched the markings on R.D.H.’s ribs.


 The soles of the white
Chic tennis shoes, size 10, seized from the residence did not resemble the markings on R.D.H.’s body. 
According to Charlotte, she wears a size 10 shoe. Further, Tyerell gave a written statement to Callahan
stating that he witnessed Charlotte brutally whipping R.D.H. with her hand and closed fist.
            According to Nolen, Charlotte was responsible for ensuring that her children were protected
and that she had a reliable and protective babysitter. Nolen testified that Charlotte admitted Tyerell
had hit R.D.H. in the past, but Nolen failed to document this statement. During her investigation,
Nolen asked L.N.A. if R.D.H. had been hurt and L.N.A. replied that “Mom hit him with a big belt.” 
According to Nolen, the marks on R.D.H.’s stomach matched the bottom indentation of a tennis shoe
found at Charlotte’s. However, Charlotte never admitted that she caused the injury to R.D.H. As a
result of her investigation, Nolen determined there was reason to believe physical abuse by an
unknown perpetrator had occurred, but made no determination that Charlotte and Tyerell had
perpetrated the abuse. Nolen was aware that Tyerell changed his story regarding the incident twice. 
However, she was unable to interview Tyerell because law enforcement decided to do so. 
            According to Weathers, Charlotte stated that she believed Tyerell had inflicted R.D.H.’s
injuries. Further, Charlotte admitted that Tyerell was very abusive to her sister. According to
Winstead, Charlotte accepted responsibility for her role in allowing R.D.H. to be left with a person
under the influence of drugs. Hunt found that L.N.A. and R.D.H. were not able to protect themselves
because both were under five years of age and that Charlotte was unwilling or unable to protect them. 
According to Hunt, R.D.H.’s injuries were very severe and could have caused his death. L.N.A. stated
that Charlotte harmed R.D.H. in some way. In Hunt’s opinion, someone in Charlotte’s home hurt
R.D.H. There was a determination of reason to believe physical abuse by an unknown perpetrator,
possibly Charlotte. 
            In his deposition and at trial, Tyerell testified that, around 6:00 p.m. on November 30, Charlotte
asked Tyerell if he would watch the children. He agreed. According to Tyerell, Charlotte told him
she was going to see a man, not Robert. She returned home in the early morning hours after he went
to sleep. At his deposition, Tyerell also testified that, on November 30, while he and Charlotte were
taking groceries in the house, R.D.H. was lying in the middle of the floor crying. When Charlotte
walked by, she kicked him on his rib cage on the left side, stating that R.D.H. cried too much. 
Afterward, Tyerell and Charlotte smoked marijuana in the house. Further, Tyerell noticed R.D.H. had
some bruises a couple of weeks before caused by Charlotte using a shoe, a belt, and some switches. 
Tyerell had seen Charlotte hit both children a “bunch of times.” However, at trial, Tyerell also
testified that his statement to the Gregg County district attorney on October 8, 2003 was a lie, that his
deposition was a lie, and that his statement to Callahan was a lie. Later, however, Tyerell testified that
his statements that Charlotte struck R.D.H. with a blue Nike shoe, that Charlotte brutally whipped
R.D.H. with her hand and closed fist, and that Charlotte got mad at R.D.H. and began to whip him
were true. 
            Marie, Charlotte’s sister, testified that Tyerell told her Charlotte beat R.D.H. In another
conversation, Tyerell admitted to “beat[ing]” R.D.H. because the child kept crying. Marie admitted
that, before this incident, Tyerell would choke her “and stuff,” but not in front of Charlotte. Marie
admitted that she never told Charlotte about these incidents.
            Although there is conflicting testimony regarding the actual perpetrator of R.D.H.’s injuries
and whether Charlotte knew Tyerell was a danger to her children, the jury could have resolved this
conflict in favor of its finding. The trial court could have disbelieved Charlotte’s account of the events
leading up to R.D.H.’s injuries, her testimony that she did not injure R.D.H., and that the relationship
between Charlotte and Robert was not abusive. The jury could have found that Charlotte knew about
Tyerell’s prior abuse of Marie and still allowed him to care for her children. Although there is some
disputed evidence, this evidence is not so significant that a reasonable trier of fact could not have
reconciled the evidence in favor of its finding and formed a firm belief or conviction that Charlotte
engaged in conduct or knowingly placed the children with persons who engaged in conduct which
endangered their physical or emotional wellbeing. Accordingly, this subpart of Charlotte’s second
issue is overruled.
Analysis for Robert
            In addition to the evidence previously described, Nolen, Hunt, and Weathers agreed that there
was no evidence or allegations that Robert had anything to do with R.D.H.’s injuries. According to
Nolen, at one time, R.D.H. apparently had some scratches and Robert was concerned about the
children’s wellbeing while they were with Charlotte. However, according to Hunt, Robert was
unwilling or unable to protect R.D.H.
            Robert testified that, prior to November 30, he and Charlotte had not been living together. That
night, Charlotte told Robert that the children were at her mother’s house and that someone was
watching them. Charlotte did not leave his house until 3:00 or 4:00 a.m. The next morning, Robert
received a telephone call that R.D.H. had been injured and went to the hospital. Robert testified that
he did not know of any other incident where R.D.H. had been hurt while in Tyerell’s possession or
another babysitter’s possession. Robert observed a small scar or gash on R.D.H.’s forehead that
Charlotte claimed occurred when she left him with a babysitter and he fell. 
            Although there is conflicting testimony regarding the actual perpetrator of R.D.H.’s injuries
and whether Robert knew that Tyerell or Charlotte was a danger to R.D.H., the jury could have
resolved this conflict in favor of its finding. The jury could have disbelieved testimony that the
relationship between Charlotte and Robert was not abusive and found that Robert failed to act to
protect R.D.H. from injury even though he was concerned about R.D.H.’s wellbeing with Charlotte.
Although there is some disputed evidence, this evidence is not so significant that a reasonable trier of
fact could not have reconciled the evidence in favor of its finding and formed a firm belief or
conviction that Robert engaged in conduct or knowingly placed R.D.H. with persons who engaged in
conduct which endangered his physical or emotional wellbeing. Accordingly, this subpart of Robert’s
second issue is overruled.
 
Best Interest of the Child
            We now turn to the trial court’s finding that termination is in the best interest of the children.
In their first issues, both Charlotte and Robert argue that there is not clear and convincing evidence
that termination is in the children’s best interest. In fact, Charlotte contends that she has demonstrated
interest in and love for the children and that there is no compelling evidence that she was ever
physically abusive to the children or that she had any major psychological problems. Robert argues
that he has demonstrated interest in and love for R.D.H., that he was never suspected of causing
R.D.H.’s injuries, and that there is no evidence that he was ever abusive to R.D.H. or that he had any
major psychological problems.
Applicable Law
            In determining the best interest of the child, a number of factors have been considered
including (1) the desires of the child; (2) the emotional and physical needs of the child now and in the
future; (3) the emotional and physical danger to the child now and in the future; (4) the parental
abilities of the individuals seeking custody; (5) the programs available to assist these individuals; (6)
the plans for the child by these individuals; (7) the stability of the home; (8) the acts or omissions of
the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any
excuse for the acts or omissions of the parent. Holley v. Adams, 544 S.W.2d 367, 371-72 (Tex. 1976).
            This list is not exhaustive, but simply indicates considerations that have been or could be
pertinent. Id. However, the best interest of the child does not require proof of any unique set of
factors nor limit proof to any specific factors. In re D.M., 58 S.W.3d at 814. The Holley test focuses
on the best interest of the child, not the parent’s best interest. Dupree v. Texas Dep’t of Protective &
Regulatory Servs., 907 S.W.2d 81, 86 (Tex. App.–Dallas 1995, no writ).
Analysis for Charlotte
            In addition to the evidence previously described, Charlotte testified that, between 2001 and
2003, she lived in six or seven different places, sometimes with Robert. Charlotte has two older
children, a son and daughter, who do not live with her. These children live with Charlotte’s aunt,
Luvenia. Charlotte admitted never giving Luvenia any money or buying anything to help support
L.N.A. Charlotte’s work history was brief and, at the time of trial, she was unemployed. At the time
of the incident, Charlotte was supporting herself and her two children with Robert’s child support
checks and was studying accounting. As a result of the investigation, Charlotte completed the
Department’s plan of service. Charlotte said she loved her children and was committed to dealing with
her issues. She and Robert have not talked about whether they intend to stay together. Charlotte
believed R.D.H. was fine, but that he will need a lot of attention and speech therapy.
            According to Nolen, no support system seemed to exist for Charlotte’s family. Luvenia
testified that she has been parenting Charlotte’s two older children since 1996 and 2000, respectively. 
Charlotte never gave Luvenia any money, diapers, or child support checks to help with her children. 
Nolen testified that Charlotte had not parented her two older children, and Weathers testified that
Charlotte had no relationship with her two older children. At no time did Charlotte report to Nolen
that she called emergency services or 911 about R.D.H.’s injuries. According to Hunt, R.D.H.’s
injuries required immediate medical attention that Charlotte failed to provide, waiting four hours to
seek medical attention after she discovered that R.D.H. was not breathing well. 
            Paulette Sullivan, an early intervention specialist with the Early Childhood Intervention
Program (“ECI”), works with children from birth to age three. In her capacity with ECI, Sullivan
evaluated R.D.H. on February 6, 2003 in the areas of cognition, communication, social emotional,
gross motor skills, fine motor skills, self-help skills, feeding skills, toileting skills, and dressing skills. 
At the time, R.D.H. was nineteen months old and delayed at least three months in all areas except for
motor skills and self-help, although these areas were still delayed. In R.D.H.’s therapeutic foster
home, he received daily input and therapies. However, R.D.H. made minimal progress. According to
Sullivan, R.D.H. has had therapy for eight months and should have made at least five or six months
of improvement. R.D.H. had no purposeful play and he did not focus or make eye contact. R.D.H.
is not learning and his language delay has become greater. R.D.H. needs to continue with ECI
intervention and, when he is three, with an all-day preschool program for children with disabilities.
            Weathers testified that both Charlotte and Robert were given separate family service plans. In
observing visits between Charlotte and R.D.H., Weathers noted that Charlotte sometimes isolated
herself on one side of the room when the paternal grandparents or father was present. Toward the
middle or the end of the visit, Charlotte would attempt to interact with R.D.H., but he usually pulled
away and returned to his paternal grandfather. On a recent visitation with Charlotte and Robert,
R.D.H. had a virus with diarrhea. Weathers brought a diaper to Robert and explained that the diaper
needed to be changed immediately. Robert tried to get the diaper open, and Charlotte got on the floor
with Weathers and tried to change the child. After Weathers removed the diaper, she had to explain
to Charlotte that R.D.H. needed to be wiped clean for a fresh diaper. According to Weathers, neither
parent seemed to know what to do to change R.D.H.’s diaper. Robert managed to get the diaper open. 
Charlotte did not seem to want to change the diaper. Weathers ended up having to change the child. 
            Weathers acknowledged that Charlotte performed the tasks on her family service plan.
However, in visitations, Weathers must still direct the visits or Charlotte tries to isolate herself during
the visits. L.N.A. is doing very well in her current placement with Luvenia. At the time she was
placed in foster care, L.N.A. had very short hair and was wearing boys’ clothing. Now, L.N.A.’s hair
has grown, and she is well-groomed, very happy, and well-mannered. L.N.A. is in Head Start, and her
teacher said that she is one of her smarter students. 
            According to Weathers, Charlotte had not shown that she would be able to parent her children
or demonstrated an ability to avoid situations that placed her children in danger of physical harm. 
Charlotte admitted that she knew Tyerell was abusive and still left her children with him. Since the
children have been in foster care, Weathers visited Charlotte when her sister, Marie, was present and
was concerned about Tyerell’s access to the home and the children if Marie stayed with Charlotte. 
According to Weathers, Charlotte has failed to demonstrate that she could control her behavior because
she was involved in family violence with the children in the home. From conversations with Charlotte,
Weathers determined that the relationship between Charlotte and Robert was unstable. If Charlotte’s
parental rights are terminated, the Department plans for the children to be adopted. At this time, an
aunt, Carol Smith, would like to adopt L.N.A., and the Department believes that ultimate placement
with her would be in the child’s best interest. Although the Department does not have someone to
adopt R.D.H., they will find an appropriate placement for him, preferably family. 
            Jan Sparks, a foster mother for medically fragile and “habilitative” children, became R.D.H.’s
foster mother in January of 2003. When R.D.H. came to her house, he was approximately eighteen
months old. He walked, but was quiet and nonverbal, speaking only two or three words. By February,
Jan realized R.D.H. was not progressing because he was still completely nonverbal, had eye aversion,
no purposeful play, problems with people and children his own age, and scared easily. R.D.H. is
aggressive towards younger children, behaves abnormally, requires a lot of attention, and is risky. 
R.D.H. does not identify borders or boundaries and, thus, he will push over a high chair containing one
of the babies. He has no purposeful play and has bitten other children. Sparks testified that there was
little interaction between Charlotte and R.D.H. when they were together.
            Winstead performed a psychological assessment of Charlotte. Based upon these tests, Winstead
found that Charlotte was struggling with significant depression, evidenced problematic personality
characteristics, and had an elevation on the child abuse potential inventory. Her parenting attitudes
were generally acceptable and adequate. Further, Charlotte exhibited some psychotic features such
as hearing babies cry. She had a history of substance abuse and may have a personality disorder. 
Charlotte has many characteristics in common with people who have physically abused their children. 
Winstead indicated that Charlotte ranked low average in intelligence. Charlotte’s counseling with
Winstead is still regular and ongoing. Winstead believed that Charlotte needed to stay out of
dysfunctional romantic relationships. Winstead agreed that Charlotte may be able to take care of her
children and be a good mother if she continued counseling and complied with his other
recommendations. However, according to Winstead, Robert had some concerns about Charlotte’s
ability to care for the children. Winstead testified that he would be very concerned about Charlotte
if her parental rights to the children were terminated.
            Luvenia testified that she takes care of three of Charlotte’s children, including L.N.A. Luvenia
believes it is in the best interest of L.N.A. and R.D.H. that Charlotte’s rights be terminated and that
they be available for adoption as long as it is with a family member. However, Luvenia stated that she
would like Charlotte to visit her children, but did not want the children returned to her care. 
            According to Hunt, R.D.H. needs special care and may need it for a long time. R.D.H. is very
irritable, fussy, and very difficult to handle. Charlotte lacked an attachment to R.D.H. and L.N.A. and,
in fact, placed her needs before theirs. R.D.H. showed no attachment to Charlotte. Hunt testified that
there is an imbalance of power between Charlotte and Robert in disciplining the child. Before the trial,
Charlotte had become hostile at visitations because R.D.H. wanted to be with his foster mother rather
than interact with her. In a July or August visitation between R.D.H. and Charlotte, R.D.H. was
having a bad day, lying on the floor, kicking and screaming. Instead of picking him up or interacting
with him, Charlotte responded by stating, “Look at him! What am I going to do with him? I can’t
handle that.” The Department has been unable to locate a therapeutic foster home willing to foster and
ultimately adopt R.D.H. Hunt concluded that, if the children were returned to Charlotte, the
Department could not guarantee their safety. However, the attorney ad litem recommended to the jury
that Charlotte’s parental rights to L.N.A. not be terminated.
            Although there is conflicting testimony regarding Charlotte’s ability to parent her children and
whether she was the perpetrator of R.D.H.’s injuries, the jury could have resolved the conflict in favor
of its finding. The jury could have disbelieved Charlotte’s testimony that she was unaware of Tyerell’s
danger to the children. The jury could have found that Charlotte had no stable residence, showed little
ability to remain employed, was unable and unwilling to parent any of her children, lacked an
attachment to either of the children, was unable and unwilling to provide necessary supplies or money
for any of her children, was unable to control her behavior or avoid situations that placed her children
in danger of physical harm, and was unable to take care of a child with R.D.H.’s special needs. 
Although there is some disputed evidence, this evidence is not so significant that a reasonable trier of
fact could not have reconciled the evidence in favor of its finding and formed a firm belief or
conviction that terminating Charlotte’s parental rights is in the best interest of the children. 
Accordingly, Charlotte’s first issue is overruled.
Analysis for Robert
            In addition to the evidence previously described, according to Charlotte, Robert did not
exercise his visitation with R.D.H. on a regular basis, although he was making regular child support
payments. Robert was unable to provide another relative for placement because his parents would not
take R.D.H. Sparks believed that Robert tried to interact with R.D.H. According to Hunt, Robert
appeared unmotivated to change, chose not to go to counseling, and failed to complete his service plan.
Hunt concluded that, if R.D.H. was returned to Robert, the Department could not guarantee his safety. 
            Weathers stated that the Department did not believe that Robert could provide a safe
environment for R.D.H. because he did not have consistent employment or housing, had not completed
required counseling, and had not reported his change of employment or address as required. Weathers
acknowledged that Robert elected not to participate in counseling or enroll in those services very early
in the case. Weathers testified that sometimes Robert did not visit R.D.H. When he did, Robert did
not interact with R.D.H. at all. When the paternal grandparents also attended visitations, R.D.H.
stayed with his grandfather the majority of the time and isolated others in the room. Although the
paternal grandparents asked for R.D.H. to be placed with them, the grandmother admitted that she had
insomnia and would not be able to take the child. Weathers stated that the Department has had
numerous scheduling problems with Robert as far as visitations and that the visitation times have been
very inconsistent. However, Robert has demonstrated an ability to avoid situations that place the child
in danger of physical harm and has shown, at times, an ability to show concern for the child’s safety. 
            According to Weathers, Charlotte and Robert contradicted each other as to whether Charlotte
was living with Robert. Further, Robert had not been able to keep steady employment. Although
Robert did see the counselor and received a drug assessment, he told Weathers that he “just stopped
going” to counseling. Weathers recommended that Robert’s parental rights be terminated because he
was not able to follow and complete the tasks in the service plan and had not shown an ability to be
a parent. If Robert’s parental rights are terminated, the Department plans for R.D.H. to be adopted. 
Although the Department does not have someone to adopt R.D.H., they will find an appropriate
placement for him, preferably family. 
            Winstead conducted a psychological assessment of Robert and saw him briefly for counseling. 
Robert had no emotional difficulties, but did show personality problems, including characteristics of
antisocial personality disorder and of obsessive-compulsive disorder. Winstead observed that Robert
expressed a rigid parenting style and showed an elevation on a dangerous subscale, or greater risk of
being a danger to himself or others. Robert’s verbal intelligence score was below average and his
nonverbal score was on the low end of the normal range. Although Winstead observed that Robert
had borderline relational functioning, he had the mental capabilities to parent. Based on his
evaluation, Winstead recommended that Robert participate in counseling. According to Winstead,
Robert did not believe that he needed counseling. Winstead believed that Robert may be an effective
parent if he undergoes parenting training, learns from it, and modifies his problematic attitudes and
approaches.
            Hall testified that he and his wife could not adopt R.D.H. or be considered for full-time
placement. However, he could take R.D.H. for the short term while Robert tried to get a better job and
education before taking over raising R.D.H. Hall does not believe it is in R.D.H.’s best interest for
Robert’s parental rights to be terminated. At trial, Robert testified that he did not know that, according
to the order establishing the parent-child relationship, he was allowed visitation with R.D.H. on the
first, third, and fifth weekends of each month. Robert testified that he saw the child whenever he and
Charlotte agreed. Sometimes he was available when the Department scheduled visitations, and
sometimes he was not. Since this case has been pending, Robert has had two or three jobs. Robert
wanted R.D.H. returned to him even though he understood that R.D.H. had special needs. Robert
testified that he has the support of his parents and that he will be able to afford daycare. Although
Robert understood that Charlotte could have injured R.D.H., he was living with her because he was
trying to be her friend for the children’s sake. However, Robert was willing to get an apartment and
take care of R.D.H. without Charlotte. Robert does not believe that termination of his parental rights
is in R.D.H.’s best interest. 
            Although there is conflicting testimony regarding Robert’s ability to parent R.D.H. and whether
he was aware of the danger to R.D.H. in Charlotte’s household, the jury could have resolved the
conflict in favor of its finding. The jury could have disbelieved Robert’s testimony that he was
unaware of the danger to R.D.H. The jury could have found that Robert was unmotivated to change,
failed to complete his service plan or go to recommended counseling, had little consistent housing or
employment, did not exercise his visitation regularly with R.D.H., did not interact with R.D.H. during
visitations, was living with Charlotte even though he knew she could have caused R.D.H.’s injuries,
and was unable to adequately parent a child with R.D.H.’s special needs. Although there is some
disputed evidence, this evidence was not so significant that a reasonable trier of fact could not have
reconciled the evidence in favor of its finding and formed a firm belief or conviction that terminating
Robert’s parental rights is in the best interest of R.D.H. Accordingly, Robert’s first issue is overruled.
Disposition
            Having overruled the issues presented by Charlotte and Robert in this appeal, the judgment of
the trial court is affirmed.
                                                                                                    DIANE DEVASTO 
                                                                                                                 Justice
Opinion delivered April 29, 2005.
Panel consisted of Worthen, C.J., Griffith, J., and DeVasto, J.
(PUBLISH)