**In the Interest of N.K. and D.T.K., Children.**

**No. 06–00–00124–CV.**

Court of Appeals of Texas, Texarkana.

Submitted Aug. 29, 2002.

Decided Feb. 5, 2003.

David C. Turner, Jr., and Jana Turner, Turner & Turner, LLP, Bonham, for Appellant.

Meredith B. Parenti, Office of the Attorney General, Assistant Solicitor General, Austin, for Appellee.

Before ROSS, CORNELIUS * and GRANT,** JJ.

**OPINION**

Opinion by Justice CORNELIUS.

Casey Kenyon appeals from a trial court judgment terminating her parental rights

---

* William J. Cornelius, Chief Justice, Retired, Sitting by Assignment

** Ben Z. Grant, Justice, Retired, Sitting by Assignment

to her children, N. K., now four and one-half years of age, and D.T.K., now three years of age. Our original opinion in this case is published at 54 S.W.3d 499 (Tex. App.-Texarkana 2001), *vacated without reference to the merits & remanded,* 89 S.W.3d 29 (Tex.2002). In that opinion, we reviewed the legal and factual sufficiency of the evidence to support the trial court's order of termination and declined to apply a heightened standard of appellate review.

In *In re C.H.,* the Texas Supreme Court determined that traditional standards of review of sufficiency of the evidence in termination cases were inappropriate, and it announced that termination cases should be reviewed using a new standard designed to determine if clear and convincing evidence supports the judgment. *In re C.H.,* 89 S.W.3d 17 (Tex.2002). The Texas Supreme Court vacated our judgment and remanded this case to us for review using the new standard announced in *In re C.H.*

Kenyon has challenged the sufficiency of the evidence to support the trial court's termination of her parental rights. Rights that inhere in the parent-child relationship are of constitutional dimensions. *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re G. M.,* 596 S.W.2d 846 (Tex.1980); *In re J. J.,* 911 S.W.2d 437, 439 (Tex.App.-Texarkana 1995, writ denied). The appellate standard for reviewing termination findings has recently been set out in detail by the Texas Supreme Court in *In re C.H.* In determining whether clear and convincing evidence exists to justify termination, we must determine whether the evidence is such that a fact-finder could reasonably form a firm belief or conviction about the truth of the State's allegations. *Id.; see* TEX. FAM. CODE ANN. § 101.007 (Vernon 2002) (" 'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to

the truth of the allegations sought to be established."). The court reasoned that this is a standard that "focuses on whether a reasonable jury could form a firm conviction or belief [yet] retains [sic] the deference an appellate court must have for the factfinder's role." *In re C.H.,* 89 S.W.3d 17, 26.

In making its decision, the Court explicitly rejected standards "that retain the traditional factual sufficiency standard while attempting to accommodate the clear-and-convincing burden of proof." *Id., see, e.g., Leal v. Tex. Dep't of Protective and Regulatory Serv.,* 25 S.W.3d 315, 321 (Tex.App.-Austin 2000); *In re W.C.,* 56 S.W.3d 863, 868 n. 3 (Tex.App.-Houston [14th Dist.] 2001, no pet.). The court also disapproved of a test articulated in several cases where the courts stated that courts of appeals must determine whether a reasonable trier of fact could conclude that the existence of a disputed fact is "highly probable." *In re C.H.,* 89 S.W.3d 17, 19. The court emphasized that, in using the new standard, we must safeguard the respective constitutional roles of juries and appellate courts.

> An appellate court's review must not be so rigorous that the only factfindings that could withstand review are those established beyond a reasonable doubt. *See Santosky v. Kramer,* 455 U.S. 745, 767–69[, 102 S.Ct. 1388, 71 L.Ed.2d 599] (holding that "beyond reasonable doubt" standard not required in termination cases). While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right.

*Id.*

In light of the new standard of review, we now examine the evidence pro-

duced in the trial of this case. The evidence shows that, in November 1998, Fannin County Child Protective Services (CPS) received a referral alleging that Mrs. Kenyon and Damien Kenyon, the children's father, were physically neglecting and emotionally abusing their children, N.K. and D.T.K. The referral specifically alleged that N.K., then two and one-half years of age, exhibited bruising and had been locked in a closet by his mother and father; Z.K., the eldest of the Kenyons' children, had missed twenty-three days of school; the children would go for days without food; they were often unsupervised; they had a history of suffering from severe diaper rash; and both parents used illegal drugs. CPS received a subsequent referral a few weeks later, with similar allegations, as well as new allegations that Mrs. Kenyon left the children with their father, who could not adequately care for them, for as long as ten hours, during which time the children were not fed properly, and that she would bring crack cocaine home to Mr. Kenyon.

During the CPS investigation, the Kenyons admitted they abused drugs and needed assistance. Ronald Hamilton, a CPS investigator, testified he found little evidence to substantiate some of the allegations, but he did determine that Mrs. Kenyon allowed the children to run around the house unsupervised while she slept.[1] Further, Debra Funtez, the court-appointed special advocate, also investigated the Kenyon family and determined they were in "great turmoil" because of the parents' drug abuse. Funtez recommended termination of Mrs. Kenyon's parental rights, opining that she was unable to care for the children and likely would not be able to do so in the foreseeable future. Funtez also noted that N.K. suffered from various insecurities, feelings of abandonment, and night terrors.

The Kenyons subsequently agreed to a service plan,[2] but CPS received two additional referrals in early January. First, Z.K. apparently did not return to school until a few days after the Christmas break. Second, the Kenyons left the children with a sitter for over twenty-four hours without sufficient food or water, while purportedly attending a job interview. At this point, CPS representatives picked up the children and placed N.K. and D.T.K. with their paternal grandmother. On January 8, four days after first leaving the children with their grandmother, the Kenyons visited the CPS office and admitted they had not been on a job interview, but rather on a "drug binge." N.K. and D.T.K. were ultimately placed in foster care. Mrs. Kenyon was unable to make satisfactory progress on her service plan because her community supervision for a criminal conviction was revoked in May 2000, and she was sentenced to ten years in prison.[3]

In March 1995, Mrs. Kenyon was sentenced to ten years' confinement, probated, for engaging in organized criminal activity

---

1. The record reflects that Mrs. Kenyon had previously left one of her children unsupervised while she slept, and the police found her eldest child, Z. K., then two years old, in the street by himself.

2. The plan required the Kenyons to: attend parenting and anger management classes, participate in marital counseling, attain stable employment, find and maintain adequate housing, submit to psychological evaluations, pay child support, and submit to random drug testing.

3. The terms of Mrs. Kenyon's sentence required a hearing after 180 days of incarceration to determine whether she should be placed on shock probation. Although the record is unclear as to the results of this hearing, Mrs. Kenyon's appellate counsel maintains that she received shock probation and is now living and working in Bonham, Texas.

in connection with her burglary of a habitation. Sometime during 1997 or 1998, she tested positive for marihuana and cocaine, at which time the State moved to revoke her community supervision. Mrs. Kenyon's community supervision was subsequently modified to require her placement at a Substance Abuse Felony Punishment Facility (SAFPF). She completed the first phase of the drug treatment program at the SAFPF, but failed to complete the second phase at the Salvation Army treatment center in Dallas.[4] She was terminated from the program for leaving the facility without permission. This conduct led to the revocation of her community supervision and the reinstatement of her ten-year prison sentence.

Before placing N.K. and D.T.K. in foster care, CPS representatives investigated the possible placement of the children with their maternal grandmother, Sheila Jacobs. However, because of a history of sexual abuse in Jacobs' home, the family's apparent nonchalant attitude toward such abuse,[5] and the concern that Jacobs might return the children to the Kenyons, CPS determined that such placement was not a satisfactory option.

Section 161.001 of the Texas Family Code governs the involuntary termination of the parent-child relationship. Pursuant to that section, a court may order termination of the parent-child relationship if it finds by clear and convincing evidence one or more of the statutory grounds set out in Section 161.001(1), and determines that termination is in the best interest of the child as required by Section 161.001(2). *See* TEX. FAM. CODE ANN. § 161.001 (Vernon 2002). Here, CPS alleged that termination was proper under Section 161.001(1)(D) and (E). Subsection (1)(D) allows termination where the parent knowingly places or knowingly allows the child to remain in conditions or surroundings that endanger the physical or emotional well-being of the child. *See* TEX. FAM. CODE ANN. § 161.001(1)(D). Subsection (1)(E) allows termination where the parent engages in conduct or knowingly places the child with persons who engage in conduct that endangers the physical or emotional well-being of the child. TEX. FAM. CODE ANN. § 161.001(1)(E). In its findings of fact and conclusions of law, the trial court found that termination was proper under both Subsections 1(D) and (E). The court also found termination to be in N.K.'s and D.T.K.'s best interests.[6]

The evidence showed that Mrs. Kenyon not only had a substance abuse problem with, at least, crack cocaine, but also that she would bring cocaine home to her husband while he was watching N.K. and D.T.K. The evidence also demonstrated that Mrs. Kenyon left her children with a

---

4. This second phase was held at an unsecured facility.

5. The family apparently made no effort to keep the children away from the sexual abuser, Jacobs' father, when he visited and allowed the eldest boy, Z.K., to travel with him.

6. The Supreme Court of Texas has provided a nonexclusive list of factors for the fact-finder to consider when ascertaining the best interest of a child:
   (A) the desires of the child; (B) the present and future emotional and physical needs of the child; (C) the present and future emotional and physical danger to the child; (D) the parenting abilities of the individuals seeking custody; (E) the programs available to assist these individuals to promote the best interests of the child; (F) the plans for the child by these individuals or by the agency seeking custody; (G) the stability of the home or proposed placement; (H) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (I) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex.1976).

sitter, and subsequently with CPS, for over four days without ample food and clothing while she was on a drug binge. Additionally, it was shown that her community supervision had been revoked, and she had been sentenced to ten years in prison for her drug possession and use.

■■■ There is little evidence that Ms. Kenyon personally committed any direct physical or emotional abuse of the children. However, the court could have found that her conduct as summarized above jeopardized the children's well-being. In order for parental conduct to constitute endangerment of the children's well-being, the conduct need not be directed at the children and the children need not actually suffer injury. Rather, endanger means to expose to loss or injury, to jeopardize. *Boyd v. Tex. Dep't of Human Servs.*, 715 S.W.2d 711, 715 (Tex.App.-Austin 1986), *rev'd on other grounds*, 727 S.W.2d 531 (Tex.1987). Further, the specific danger to the children's well-being need not be established as an independent proposition, but may be inferred from parental misconduct. *Id.* at 533; *In re King*, 15 S.W.3d 272, 276–77 (Tex.App.-Texarkana 2000, pet. denied); *In re J.J.*, 911 S.W.2d at 440. Evidence of a parent's imprisonment may also contribute to a finding that the parent engaged in a course of conduct that endangered the children's physical and emotional well-being. *In re Boyd*, 727 S.W.2d at 534.

Here there is evidence, not only of Mrs. Kenyon's imprisonment, but also that her conduct placed her children in serious risk of both physical and emotional abuse. Julie Ann Ford, N.K.'s and D.T.K.'s foster mother, testified that, at the age of two and one-half years, N.K. exhibited a fear that the "[p]olice were after him" and that he had to "[h]ide the drugs." Ford also testified that N.K. would pick up pieces of paper off the ground, roll them up, and ask her other children if they wanted a "joint" to "get high." Finally, Ford testified that N.K., while having his diaper changed, would point to his penis saying, "Suck my D–I–C–K" or gyrate his hips in an upward thrusting motion saying, "Hump, hump, want to hump, are you going to touch me there?"[7] At the time referenced by Ford, D.T.K. was still an infant and could not yet speak. In light of this evidence, we cannot say that the trial court erred in finding that Mrs. Kenyon knowingly placed the children in conditions that endangered their physical and emotional well-being. The trial court could reasonably form a firm belief that, based on her actions as shown by this evidence as well as by persistently engaging in illegal conduct, such as using crack cocaine, Mrs. Kenyon knowingly engaged in conduct that endangered the physical and emotional well-being of her children.

■■■ Furthermore, the trial court did not err in finding there was clear and convincing evidence that terminating Mrs. Kenyon's parental rights was in the children's best interests. Although Mrs. Kenyon has allegedly been released from prison and placed on community supervision, she is likely to remain on community supervision for ten years, and her past conduct indicates that she had difficulty complying with the terms of her community supervision, especially abstinence from illegal drug use. These facts, coupled with the young age of her children, make the

---

**7.** Although there appears to be no direct evidence of how or where N.K. learned these crude sexual and drug-related phrases, the trial court was well within its discretion to reasonably infer that, since neither N.K. nor D.T.K. spent any meaningful time outside of Mrs. Kenyon's custody, N.K. was simply emulating the language and behaviors he witnessed at home.

case for parental rights termination quite compelling. Funtez testified that the relative youth of the boys made them more adoptable, and because they had been in a foster home since the ages of two and one, the transition from foster care to adoption by the foster parents would be less traumatic.[8] Moreover, according to Ford, N.K. is extremely concerned about where he is going to "be forever," and has told her, "Mommy, I love you, I want to stay here, I don't want to leave."[9]

We conclude that, based on this evidence, the trial court in this case could readily have reached the necessary firm conviction or belief that the State's allegations were true and that the extreme step of termination of Kenyon's parental rights was in the best interests of the children.

We affirm the judgment of the trial court.

---

8. Ford testified that she and her husband are interested in adopting both N.K. and D.T.K.

9. The need for permanence is the paramount consideration for the children's present and future physical and emotional needs. The goal of establishing a stable, permanent home for a child is a compelling interest of the government. *In re S.H. A.,* 728 S.W.2d 73, 92 (Tex.App.-Dallas 1987, writ ref'd n.r.e.). The threat of present or further incarceration makes Mrs. Kenyon's future uncertain.