NO.
12-05-00077-CV

 

IN THE COURT OF APPEALS

 

TWELFTH COURT OF APPEALS DISTRICT

 

TYLER, TEXAS

 

 

§          APPEAL
FROM THE 8TH

 

IN THE INTEREST OF
K.H., K.H., AND §          JUDICIAL DISTRICT COURT OF

L.H., MINOR CHILDREN

§          HOPKINS
COUNTY, TEXAS

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 

 



MEMORANDUM OPINION

            Jeremy[1]
and Christina Peckham appeal the termination of their parental rights.  In two issues, Jeremy and Christina challenge
the order of termination.  We affirm.

 

Background

            Christina
is the mother of three children, K.H., born March 28, 2002, K.H., born June 1,
2003, and L.H., born September 7, 2004.[2]  Michael Slater[3]








 is the father of K.H.1 and Jeremy is the
father of the two younger children. 
Christina and Jeremy married approximately three months after K.H.1 was
born.  On July 30, 2003, the Texas
Department of Protective and Regulatory Services (the “Department”) filed an
original petition for protection of K.H.1 and K.H.2, for conservatorship, and
for termination of Christina’s, Michael’s, and Jeremy’s parental rights.  In an affidavit attached to the petition,
Belinda White (formerly “Morrow”), an investigator with the Department,
requested that the Department be appointed temporary managing conservator of
the children to ensure their safety and well being because of domestic violence
in the residence and physical neglect of the children. On August 7, 2003, the
Department was appointed temporary managing conservator of K.H.1 and K.H.2, and
the parents were appointed temporary possessory conservators.  Both parents were ordered to comply with each
requirement of the Department’s original, or any amended, service plan during
the pendency of the suit.  Morever, the
trial court found and notified both Christina and Jeremy that each of the
actions required of them were necessary to obtain the return of the children,
and that failure to fully comply with these orders might result in the
restriction or termination of their parental rights. 

            After
L. H. was born, the Department, on October 25, 2004, filed an original petition
for protection of L.H., for conservatorship, and for termination of Christina’s
and Jeremy’s parental rights.  In an
affidavit attached to the petition, Amanda Cedillo, an investigator with the
Department, stated that she had “grave” concerns for L.H.’s well being based
upon an ongoing case with his two older siblings who were in foster care and
issues concerning physical neglect, confirmed cigarette burns on L.H.’s arm,
conflicting stories from Christina regarding the origin of these burns, issues
regarding nutrition and feedings, and lack of bonding and disregard for L.H.’s
needs during an emergency room visit. Due to these concerns, Cedillo stated
that L.H. had been placed in foster care and requested that the Department be
appointed temporary managing conservator of L.H.  The Department was appointed temporary
managing conservator of L.H., but the parents were not appointed temporary
possessory conservators.  








            On
November 17, the trial court consolidated the two cases.  A jury trial was conducted in January
2005.  At the conclusion, the jury found,
by clear and convincing evidence, that Jeremy and Christina had engaged in one
or more of the acts or omissions necessary to support termination of their
parental rights.  The jury also found, by
clear and convincing evidence, that termination of the parent-child
relationship between Jeremy, K.H.2, and L.H. was in the children’s best
interest.  The jury further found, by
clear and convincing evidence, that termination of the parent-child
relationship between Christina, K.H.1, K.H.2, and L.H. was in the children’s
best interest.  Based on these findings,
the trial court ordered termination of Jeremy’s and Christina’s parental
rights. This appeal followed.

 

Jury Charge

            In
their first issue, Jeremy and Christina argue that the trial court erred when
it refused to submit their requested jury charge, including their definitions
of “endanger” and “conduct.”  The  Department 
contends that Jeremy did not request the proposed charge or object to
the definitions of “endanger” and “conduct” included in the submitted
charge.  Therefore, the Department
contends, he has not preserved the complaint he raises on appeal.  The Department also argues that the trial
court did not abuse its discretion in refusing to submit the proposed
definitions.

Applicable Law

            Texas
Rule of Civil Procedure 277 provides that the trial court shall submit such
instructions and definitions as shall be proper to enable the jury to render a
verdict.  Tex. R. Civ. P. 277; Magro v. Ragsdale Brothers, Inc.,
721 S.W.2d 832, 836 (Tex. 1986).  A trial
court’s refusal to submit requested instructions will not be reversed on appeal
unless the court abused its discretion.  See
Magro, 721 S.W.2d at 836; Harris County v. Bruyneel, 787
S.W.2d 92, 94 (Tex. App.–Houston [14th Dist.] 1990, writ denied). No abuse of
discretion is shown unless the requested instructions were so necessary to
enable the jury to render a proper verdict that the court’s refusal to include
them in the charge probably caused the rendition of an improper verdict.  See Harris County, 787 S.W.2d
at 94.  Explanatory instructions should
be submitted when in the sole discretion of the trial judge they will help
jurors understand the meaning and effect of the law and the presumptions the
law creates.  Ishin Speed Sport,
Inc. v. Rutherford, 933 S.W.2d 343, 349 (Tex. App.–Fort Worth 1996, no
writ.).  Any complaint about a jury
charge is waived unless specifically included in an objection.  Tex.
R. Civ. P. 274; Tex. R. App. P. 33.1(a);
In re B.L.D., 113 S.W.3d 340, 349 (Tex. 2003).  A party must make the trial court aware of
the complaint, timely and plainly, and obtain a ruling.  In re B.L.D., 113 S.W.3d at
349.

Analysis

            Christina
and Jeremy filed requested charges with the trial court, asking that the
definition of “endanger” be added to the jury charge to explain Texas Family
Code sections 161.001(1)(D) and (E), and that the definition of “conduct” be
added to explain Texas Family Code 161.001(1)(E).  At trial, Christina properly objected to the proposed
jury charge and  requested the above
definitions. The trial court denied her requested definitions.  Jeremy objected to the proposed jury charge
definition of “clear and convincing.” 
However, he did not join in the objections regarding the definitions of “endanger”
and “conduct,” stating that he had no “additional” objections.  Because Jeremy failed to object to the
definitions of which he now complains, he did not preserve the issue for
appeal.  See Tex. R. Civ. P. 274.  We overrule Jeremy’s first issue.

            Regarding
Christina’s objections, the jury charge stated that “endanger” means “to expose
to loss or injury, to jeopardize.”  The
charge stated that it was not necessary that the conduct be directed at the
children or that the children actually suffer injury.  However, the jury charge also included the
statutory language regarding termination of parental rights according to
sections 161.001(1)(D) and (E).  The
requested definition of “endanger” was that it “means more than threat of
metaphysical injury or possible ill effects of less-than-ideal family
environment.  There must be evidence of
endangerment to the child’s physical or emotional well-being as a direct result
of the conditions in which the child was placed.”  The requested definition of “conduct” was
that under section 161.001(1)(E), conduct “must be more than a single act or
omission; a voluntary, deliberate, and conscious ‘course of conduct’ by the
parent is required.”  Although we admit
that the requested definitions are more detailed than those in the jury charge,
we cannot conclude that these definitions 
were necessary for the jury to render a proper verdict.  See Harris County, 787 S.W.2d
at 94.  Thus, the trial court did not
abuse its discretion in refusing to submit the requested definitions.  We overrule Christina’s first issue.

 

Termination
of Parental Rights

            Involuntary
termination of parental rights embodies fundamental constitutional rights.  Vela v. Marywood, 17 S.W.3d
750, 759 (Tex. App.–Austin 2000), pet. denied per curiam, 53 S.W.3d 684
(Tex. 2001); In re J.J., 911 S.W.2d 437, 439 (Tex. App.–Texarkana
1995, writ denied).  A termination decree
is “complete, final, irrevocable [and] divests for all time the parent and
child of all legal rights, privileges, duties, and powers with respect to each
other except for the child’s right to inherit.” 
Wiley v. Spratlan, 543 S.W.2d 349, 352 (Tex. 1976); In
re Shaw, 966 S.W.2d 174, 179 (Tex. App.–El Paso 1998, no pet.)  Because a termination action “permanently
sunders” the bonds between a parent and child, the proceedings must be strictly
scrutinized.  Wiley, 543
S.W.2d at 352; In re Shaw, 966 S.W.2d at 179.  However, parental rights are not absolute,
and it is vital that the emotional and physical interests of the child not be
sacrificed at the expense of preserving that right.  In re C.H., 89 S.W.3d 17, 26
(Tex. 2002).








            Section
161.001 of the Family Code permits a court to order termination of parental
rights if two elements are established.  Tex. Fam. Code Ann. § 161.001 (Vernon
2002); In re J.M.T., 39 S.W.3d 234, 237 (Tex. App.–Waco 1999, no
pet.).  First, the parent must have
engaged in any one of the acts or omissions itemized in the first subsection of
the statute. Tex. Fam. Code Ann. § 161.001(1)
(Vernon 2002); Green v. Texas Dep’t of Protective & Regulatory Servs.,
25 S.W.3d 213, 219 (Tex. App.–El Paso 2000, no pet.); In re J.M.T.,
39 S.W.3d at 237.  Second, termination
must be in the best interest of the child. 
Tex. Fam. Code Ann. §
161.001(2) (Vernon 2002); In re J.M.T., 39 S.W.3d at 237.  Additionally, both elements must be
established by clear and convincing evidence, and proof of one element does not
alleviate the petitioner’s burden of proving the other. Tex. Fam. Code Ann. § 161.001; Wiley, 543
S.W.2d at 351; In re J.M.T., 39 S.W.3d at 237. 

            Due
process requires a petitioner to justify termination by clear and convincing
evidence because termination is such a drastic remedy.  In re J.M.T., 39 S.W.3d at
237.  The clear and convincing standard
for termination of parental rights is both constitutionally and statutorily
mandated.  Tex. Fam. Code Ann. § 161.001; In re J.J., 911
S.W.2d at 439.  Clear and convincing
evidence means “the measure or degree of proof that will produce in the mind of
the trier of fact a firm belief or conviction as to the truth of the
allegations sought to be established.”  Tex. Fam. Code Ann. § 101.007 (Vernon
2002).  There is a strong presumption
that the best interest of the child is served by preserving the parent-child
relationship.  Wiley, 543
S.W.2d at 352; In re J.M.T., 39 S.W.3d at 240.  Thus, the burden of proof is upon the person seeking
to deprive the parent of their parental rights. 
In re J.M.T., 39 S.W.3d at 240.

 

Standard of
Review

            When
confronted by both a legal and factual sufficiency challenge, an appellate
court must first review the legal sufficiency of the evidence.  Glover v. Texas Gen. Indem. Co.,
619 S.W.2d 400, 401 (Tex. 1981); In re M.D.S., 1 S.W.3d 190, 197
(Tex. App.–Amarillo 1999, no pet.). 
Because termination findings must be based on clear and convincing
evidence, the standard of review is not the same on appeal as a finding based
upon a preponderance of the evidence.  In
re J.F.C., 96 S.W.3d 256, 264 (Tex. 2002).  Therefore, in conducting a legal sufficiency
review, we must look at all the evidence in the light most favorable to the
finding to determine whether a reasonable trier of fact could have formed a
firm belief or conviction that its findings were true.  Id. at 266.  We must assume that the fact finder settled
disputed facts in favor of its finding if a reasonable fact finder could do so
and disregard all evidence that a reasonable fact finder could have disbelieved
or found incredible.  Id.  This does not mean that we are required to
ignore all evidence not supporting the finding because that might bias a clear
and convincing analysis.  Id.

            The
appropriate standard for reviewing a factual sufficiency challenge to the
termination findings is whether the evidence is such that a fact finder could
reasonably form a firm belief or conviction about the truth of the petitioner’s
allegations.  In re C.H.,
89 S.W.3d at 25.  In determining whether
the fact finder has met this standard, an appellate court considers all the
evidence in the record, both that in support of and contrary to the trial court’s
findings.  Id. at
27-29.  Further, an appellate court
should consider whether disputed evidence is such that a reasonable fact finder
could not have reconciled that disputed evidence in favor of its finding.  In re J.F.C., 96 S.W.3d at 266.


            This
standard retains the deference an appellate court must have for the fact finder’s
role.  In re C.H., 89
S.W.3d at 26.  Additionally, the trier of
fact is the exclusive judge of the credibility of the witnesses and the weight
to be given their testimony.  Nordstrom
v. Nordstrom, 965 S.W.2d 575, 580 (Tex. App.–Houston [1st Dist.] 1997,
pet. denied).  Thus, our review must not
be so rigorous that only fact findings established beyond a reasonable doubt
could withstand review.  In re C.H.,
89 S.W.3d at 26.

 

Termination
Under Section 161.001(1)(O)

            As
part of their second issue, Christina and Jeremy contend that the evidence is
legally and factually insufficient to support the trial court’s finding that
they failed to comply with the provisions of a court order that specifically
established the actions necessary for them to obtain the return of K.H.1 and
K.H.2.  They argue that there was
ambiguity and vagueness between the trial court’s orders and what the jury was
told they were required to do, that they “minimally” complied with the service
plan in August 2004, and that they did not violate any specific order.

Applicable Law and Analysis

            A
court may order termination of the parent-child relationship if the court finds
by clear and convincing evidence that the parent has failed to comply with the
provisions of a court order that specifically established the actions necessary
for the parent to obtain the return of a child who had been in the permanent or
temporary managing conservatorship of the Department for not less than nine
months as a result of the child’s removal from the parent under Chapter 262 for
the abuse or neglect of the child.   Tex.
Fam. Code Ann. §161.001(1)(O) (Vernon 2002). 

            It
is undisputed that the Department had temporary managing conservatorship of
K.H.1 and K.H.2 since August 7, 2003. 
According to White, the case was initiated because of domestic violence
in the home and physical neglect of both children.  This evidence establishes that K.H.1 and
K.H.2 were removed as a result of Christina’s and Jeremy’s abuse or
neglect.  Each of the two service plans
admitted into evidence required tasks to be completed by the parents and were
divided into “areas of concern.”  We will
address each area of concern, the tasks required of the parents, and their
completion and demonstration of these tasks.[4]

Child Vulnerability

            Both
parents were required to address physical abuse concerns and ordered to attend
parenting classes and to demonstrate the skills that they learned.  Regarding these tasks, a progress report
dated May 20, 2004 stated that the parents attended all parenting classes and
received a certificate of completion. 
Further, the parents began unsupervised visits on March 8 and the
Department’s worker monitored the visits through unexpected drop-in
visits.  The Department worker noted that
the parents had difficulty maintaining a proper feeding regime for the children
as well as keeping them clean.  Christina
stated that, most of the time, she practiced what she learned in parenting
classes, but admitted that she failed sometimes.

Caregiver Capability

            Both
parents were required to learn appropriate ways to handle their anger.  They were

ordered to actively participate in
counseling, individually and together, to address anger management skills and
domestic violence issues, demonstrate their skills, and participate in play
therapy. According to the May 20 progress report, the parents’ counselor was
concerned about the lack of change in the parents’ behavior and patterns, both
parents continued to be in denial, and domestic violence issues continued in
the home.  The Department’s worker, the
Court Appointed Child Advocate (“CASA”) worker, and the homemaker, Lisa
LaFever,[5]
assigned to work with the parents, 
noticed an increase in stress in the parents since visitations were
increased.  Christina denied that Jeremy
had ever hit her or that she had hit him intentionally, although they wrestled
and played around.  She admitted that she
and Jeremy had arguments, but never “all and all out beat each other.” 

            Mitzi
Stephens, a family and children’s worker with the Department, stated that she
was involved in the case for three months beginning in August 2003.  She was concerned that the parents continued
to deny that they had any problems in their home, continued to deny that there
was a domestic violence issue, and continued to deny the reason their children
were removed.  Stephens agreed that, for
the most part, Christina and Jeremy were doing what she told them to do,
including parenting classes, anger management classes, and visitations. 

            Reba
Clark, a licensed professional counselor, began counseling Christina and Jeremy
on September 30, 2003 and ended her services in June 2004.  She worked with Christina and Jeremy on
issues regarding allegations of domestic violence, family dynamics, and marital
problems.  Clark stated that Christina and
Jeremy consistently denied that they had any kind of domestic violence problem.  Jeremy informed Clark that he had been to a
class in anger management, did not feel that he needed it, and was not
receptive to doing it again.  Clark
testified that she was concerned that Jeremy was too reliant and dependent upon
Christina for his reactions.  She
observed substantial improvement with Christina regarding her issues.  According to Jennifer Durham, a case worker
with the Department, the parents attended counseling and completed
psychological evaluations, but did not demonstrate anything that they learned
in counseling.

Maltreatment Pattern

            Both
parents were ordered to demonstrate the ability to protect their children from
future abuse and show concern for their children’s future safety.  They were ordered to stay away from or
supervise their children when visiting relatives with a history of domestic
violence or abuse.  The May 20 progress
report acknowledged a high level of concern because of the history of violence
in the family.  Christina admitted that
she wanted her mother to move in with her and Jeremy, but that the Department
would not allow it because of her mother’s past history with the Department. 

Quality of Care

            Both
parents were ordered to maintain a relationship with their children while they
were in foster care, demonstrate the ability to provide their children with
adequate care and nurturance, keep the children safe and clean during
visitations, and provide food, shelter, clothing, and age related supervision
for the children.  The Department noted
concerns of cleanliness and roach infestation of the home.  However, the progress reports noted that, for
the most part, the parents had attended and actively participated in
visitations.

            Christina
admitted missing several, if not half, of the scheduled visitations with her children
in August, September, and October 2004. 
During one scheduled visit, she was in the hospital giving birth to
L.H.  Christina admitted that,  in the October 8 court hearing, the
Department stated that, if she and Jeremy visited the children on four
consecutive scheduled dates, it would consider a monitored return.  However, she admitted missing all four
visitations.  She explained that one of
the visits was on Columbus Day and that they believed they could not see the
children on a holiday. Christina stated that, although Jeremy attempted to call
the Department office, he did not receive an answer.  The next week, she did not visit the children
because she and Jeremy were moving appliances into their apartment.  Stephens stated that some of the visitations
between the parents and the children were appropriate, and some were not.  Stephens stated that although it was
appropriate that the parents brought cameras to the visits, they took pictures
one after the other instead of visiting with their children.  Stephens also stated that, in visits with
K.H.2, both parents would hold K.H.2, talk to her, feed her, and change her
diaper. 

            Durham
began working with Christina and Jeremy in November 2003 and left the case in
August 2004.  Durham’s main concern was
that the parents did not respond to the service plan and did not appear to be
concerned about the tasks that needed to be completed in order to have their
children returned.  They did not appear
to be loving, nurturing, or caring toward the children nor did they appear to
participate much in activities with the children.  Neither parent demonstrated parenting skills
when Durham visited their home. 
According to Durham, the parents had to be told to change diapers and to
be sure to have formula and food.  They
also had to be told the feeding regime. 
Durham testified that, during one visitation, K.H.2 was on the floor
while Christina was on the couch.  Durham
stated that pieces of food were all over the floor and K.H.2 picked up a piece
of hot dog and began to choke.  Christina
failed to respond.  Durham stated that
she had to point out that K.H.2 was choking. 
During another visitation, K.H.1 had diarrhea running out of her diaper
and down her legs.  Durham stated that
the parents saw the situation, but did not respond.  Christina’s and Jeremy’s lack of response
concerned Durham.  When the children were
sick, the parents did not hold them, call the doctor, or call the Department
worker as requested.  On several occasions,
she discovered an antibiotic on the table when it should have been
refrigerated.

            Ginger
Brooks, a licensed professional counselor, provided play therapy or counseling
for K.H.1 beginning March 22, 2004 and ending September 29, 2004.  She observed K.H.1 and the family unit.  In the beginning, Brooks observed little
interaction between the parents and the children.  Most of Christina’s interaction was with
K.H.1, and most of Jeremy’s was with K.H.2. Brooks was concerned because she
felt that Christina neglected K.H.2 and did not show any parental care that
would lead to their forming an attachment. 
Brooks stated that she rarely saw Christina touch K.H.2, smile at her,
verbalize or make eye contact with her, or gaze in her direction.  Christina admitted that she never had a bond
with K.H.2 

            Brooks
observed some improved attachment.  In
August, she and K.H.1 were outside the building and, when K.H.1 saw Christina
in the parking lot, she cried out “mom” and went towards her. Brooks observed
that Christina and K.H.1 had a lack of attachment, and she saw no attachment at
all between Christina and K.H.2.  Brooks
did not see any attachment between Jeremy and K.H.1 and only a limited
attachment between Jeremy and K.H.2. 
Brooks agreed that the lack of hours that Christina and Jeremy spent
with the children could cause problems with attachment.

            Cindy
Mannon, the CASA worker for the children, testified that she was concerned in
the initial visitations because the visits seemed to be more about getting
pictures.  After Christmas, Christina and
Jeremy began visitations with the children at their home, and Mannon checked on
the parents once or twice per day during the three day visits.  Over time, it became clear to Mannon that
Christina and Jeremy were not going to cooperate or do what was required by the
Department. Although they attended parenting classes, they did not apply what
they learned.  Mannon stated that, most
of the time, K.H.2 was not held and was either in the play pen or on the floor.  K.H.1 would be watching cartoons.  Mannon stated that, when she picked up the
children after their three day visitations, they were dirty.

            Mannon
testified that, during one three day visitation in March 2004, she checked on
Christina and Jeremy in the late afternoon at the beginning of the
visitation.  Christina and Jeremy
admitted to Mannon that K.H.2 had not had a bottle all day.  She stated that K.H.2 was obviously hungry, “lurching”
toward food that was not baby food. 
Jeremy attempted to feed K.H.2, but she was so hungry that she was
fighting the spoon.  As a result, Jeremy
told Mannon that K.H.2 was not hungry and gave up trying to feed her.  Mannon discovered that they did not have any
other baby food and, although they had baby formula, they did not have a nipple
for the bottle.  At that point, Mannon
bought baby food, a bottle, nipples, and juice and brought the food back to the
family. 

Home Environment

            Both
parents were ordered to provide an appropriate home for small children, provide
financially for the children, and have needed items for small children.  Christina was ordered to look into obtaining
her General Education Development diploma (“GED”) to increase her employability
and the family’s income.  Jeremy was
ordered to assess his employability, job skills, and potential employment.  Both parents were ordered to show that they
could provide adequate income, decent housing, reliable transportation, and all
the daily provisions for developing children. 
The May 20 progress report acknowledged that Jeremy found a job, but
that Christina remained unemployed. Further, the report noted that Christina
discontinued GED classes.

            Christina
admitted that her rent had not been paid consistently and that she was evicted
from her apartment in May 2004.  She was
able to find another apartment when a church paid the deposit and first month’s
rent.  However, she also admitted that,
prior to trial, she was served with an eviction notice for her current
apartment for nonpayment of rent, but was not evicted because her attorney
loaned her the money for rent.  Christina
stated that she worked for Avon for a few months, the only job she obtained
during the pendency of the cases.  Later
in her testimony, Christina stated that, the week after trial, she would begin
babysitting six children in her apartment for her sister and a friend.  As a result, she would be making
approximately $250 per week. However, she acknowledged that she had not checked
with the health department regarding her babysitting and did not know the
difference between babysitting and daycare. 
According to Christina, Jeremy was working steadily, making
approximately $5.85 per hour, seven days a week including overtime.

            Christina
admitted that she did not obtain her GED, but argued that the classes
interfered with her parenting classes and visitations.  Christina stated that, after missing four
Monday GED classes because of the conflicting classes, she was “disqualified”
to continue.  She also stated that, after
parenting classes were completed, she had to wait for the next semester to
attend GED classes, but could not attend because Jeremy was working and she had
the children. 

            Clark
worked with both parents on their job skills and opportunities, communication,
problem solving, decision making, and budgeting.  Although Clark encouraged Christina to obtain
her GED, Christina did not follow through and told Clark that she did not need
it.  According to Clark, Christina stated
that she did not want to work, that she wanted to be a stay-at-home mother, and
that she did not need the education. 
Clark stated that it was impossible to “add up” the family’s income
versus expenses.  Clark stated that, when
Christina attempted to figure their budget, she used actual figures, but would
add in income that she “could” make. 
Clark stated she told them that Jeremy needed to work, but denied
telling them that Jeremy had to get a certain high paying job.

            Stephens
was also concerned about Christina’s and Jeremy’s financial ability to care for
themselves, even without the children. 
At the time, the only income they had was from a part time job working
with Christina’s mother providing home health care.  On September 29, 2003, Stephens visited
Christina’s and Jeremy’s home and found it appropriate and clean.  She also stated that the parents had formula,
diapers, and necessities for both children. 
Lisa LaFever, the homemaker 
assigned to work with Christina and Jeremy, said she never witnessed the
parents not tending to the children’s needs, but admitted that she saw the
parents with their children only seven times. Although LaFever stated that her
assessment was “good,” it was not her duty to report on the family’s progress
in the areas that she taught.

Social Environment

            Both
parents were required to be and have their home free of drug or alcohol
problems or concerns and participate in a drug and alcohol assessment.  The May 20 progress report stated that the
assessment was completed with no further recommendations.

Response to Intervention

            Both
parents were ordered to cooperate with the Department and follow any and all
recommendations.  The May 20 progress
report stated that the parents had problems with denying stress or issues to be
addressed in counseling.  The progress
report also stated that the children had not been clean upon leaving the
parents’ house and had flea or roach bites on them.  The report included concerns that the
children lacked adequate care. 

            We
note that, in the August 9, 2004 permanency hearing order, the trial court
found that both parents had minimally demonstrated adequate and appropriate
compliance with the service plan. However, in the October 8, 2004 permanency
hearing order, the trial court found that neither parent had fully demonstrated
adequate and appropriate compliance with the service plan.  Further, John Watkins, the conservatorship
supervisor at the Department, stated that he was not happy with Christina’s and
Jeremy’s compliance with the service plan. 
His primary concern was Christina’s and Jeremy’s ability to demonstrate
skills they had been taught and, in his opinion, neither had followed through
with the service plan.  Watkins stated
that both parents refused to acknowledge the issues resulting in the Department’s
involvement and did not make significant changes in their lives to keep the
Department from being involved.

Conclusion

            Viewing
the evidence in the light most favorable to the finding, a reasonable fact
finder could have concluded that Christina and Jeremy failed to comply with the
Department’s service plan.  Both parents
had difficulty maintaining a feeding regime, providing food, adequate care, and
nurturance. They failed to provide age related supervision, having to be told
to help a choking child, change a diaper, obtain food, and refrigerate
medication.  They failed to demonstrate the
skills they learned in parenting classes and counseling and denied having any
domestic violence problem.  Both parents
failed to bond with their children or attempt to bond with them, missing
numerous visitations and failing to interact with their children.  Christina failed to obtain her GED or a
job.  The parents were evicted from at
least one apartment and, on only one small income, were unable to provide
financially for the children.  Therefore,
we conclude that the evidence, viewed in the light most favorable to the
finding, was sufficiently clear and convincing that a reasonable trier of fact
could have formed a firm belief or conviction that Christina and Jeremy failed
to comply with the provisions of a court order that specifically established
the actions necessary for them to obtain the return of K.H.1 and K.H.2 who had
been in the permanent or temporary managing conservatorship of the Department
for not less than nine months as a result of the children’s removal from the
parent under Chapter 262 for the abuse or neglect of the children.  See Tex.
Fam. Code Ann. § 161.001(1)(O).

            Although
there is conflicting evidence that Christina and Jeremy attended parenting
classes, visitations, and counseling, the jury could have found that they
failed to demonstrate any of the skills learned in these tasks.  The jury could have found that mere
completion of parenting classes, for instance, was not compliance when they
failed to demonstrate parenting skills. 
Moreover, this evidence is not so significant that a reasonable trier of
fact could not have reconciled this evidence in favor of its finding and formed
a firm belief or conviction that Christina and Jeremy failed to comply with the
provisions of a court order that specifically established the actions necessary
for them to obtain the return of K.H.1 and K.H.2 who had been in the permanent
or temporary managing conservatorship of the Department for not less than nine
months as a result of the children’s removal from the parent under Chapter 262
for the abuse or neglect of the children. 
See Tex. Fam. Code Ann.
§ 161.001(1)(O).  Accordingly, that
portion of Christina’s and Jeremy’s second issue regarding K.H.1 and K.H.2 is
overruled.[6]

 

Termination
Under Section 161.001(1)(E)

            As
part of their second issue, Christina and Jeremy contend that the evidence is
legally and factually insufficient to support a finding that they engaged in
conduct or knowingly placed L.H. with persons who engaged in conduct that
endangered his physical or emotional well being. 

Applicable Law








            Section
161.001(1)(E) of the Texas Family Code states that the court may order
termination of the parent-child relationship if the court finds by clear and
convincing evidence that the parent has engaged in conduct or knowingly placed
the child with persons who engaged in conduct which endangers the physical or
emotional well being of the child.  Tex. Fam. Code Ann. § 161.001(1)(E)
(Vernon 2002).  The specific danger to
the child’s well being need not be established as an independent proposition,
but may instead be inferred from parental misconduct.  Texas Dep’t of Human Svcs. v. Boyd,
727 S.W.2d 531, 533 (Tex. 1987); In re J.J., 911 S.W.2d at
440.  Further, scienter is not required
for a parent’s own acts under section 161.001(1)(E), although it is required
when a parent places his child with others who engage in endangering acts.  In re U.P., 105 S.W.3d 222, 236
(Tex. App.–Houston [14th Dist.] 2003, pet. denied).  Finally, the need for permanence is a
paramount consideration for the child’s present and future physical and
emotional needs.  In re N.K.,
99 S.W.3d 295, 301 n.9 (Tex. App.–Texarkana 2003, no pet.); In re M.D.S.,
1 S.W.3d at 200. 

            As
previously discussed, “endanger” means to expose to loss or injury or to
jeopardize. Boyd, 727 S.W.2d at 533; In re D.M., 58
S.W.3d 801, 811 (Tex. App.–Amarillo 2001, no pet.).  It is not necessary that the conduct be
directed at the child or that the child actually suffers injury; rather, it is
sufficient that the child’s well being be jeopardized or exposed to loss or
injury.  Boyd, 727 S.W.2d
at 533; In re J.J., 911 S.W.2d at 440. 

            Subsection
(E) requires us to look at the parent’s conduct alone, including actions,
omissions, or the parent’s failure to act. 
In re D.J., 100 S.W.3d 658, 662 (Tex. App.–Dallas 2003,
pet. denied); In re D.M., 58 S.W.3d at 811.  It is inconsequential that the parental
conduct occurred before the child’s birth. 
In re U.P., 105 S.W.3d at 229; In re D.M.,
58 S.W.3d at 812.  Instead, courts look
to what the parent did both before and after the child’s birth to determine
whether termination is necessary.  In
re D.M., 58 S.W.3d at 812. 
Further, termination under subsection (E) must be based on more than a
single act or omission.  Id.;
In re D.T., 34 S.W.3d 625, 634 (Tex. App.–Fort Worth 2000, pet.
denied).  A voluntary, deliberate, and
conscious “course of conduct” by the parent that endangers the child’s physical
and emotional well being is required.  In
re D.M., 58 S.W.3d at 812; In re D.T., 34 S.W.3d at 634. 

Analysis

            Regarding
the parental rights of L.H. only, Joshua Lockwood, Christina’s cousin,
testified that he lived with Christina’s mother, Christina, Jeremy, and L.H. at
the end of September 2004. He contacted CASA on October 22, 2004 after noticing
burn marks on L.H.’s arm.  Lockwood
testified that the marks on L.H.’s arm looked like cigarette burn marks,
perfectly circular, and three of them were on his upper arm.  Lockwood also stated that L.H. had a slight
diaper rash that did not “look good,” but admitted treating it with medication
that Christina gave him.  Although it was
the parents’ job, Lockwood stated, he changed most of L.H.’s diapers and
testified that, in the mornings, Christina and Jeremy would not wake up when
the baby screamed.

            Cedillo
testified that she received a report on October 22 alleging that L.H. had burn
marks on his arm and a diaper rash, and was not being fed appropriately.  Upon arriving at the parents’ apartment,
Cedillo found Brandi Higar watching L.H., and five to seven other people were
coming in and out of the apartment. 
According to Cedillo, Higar was familiar to her from a previous
investigation of alleged neglect of Higar’s child.  Cedillo stated that Higar would not let her
see L.H. until she checked with Christina and, when contacted, Christina asked
Cedillo to wait outside until she arrived. 
When Christina arrived, she told Cedillo that there were no marks on
L.H.  Cedillo stated that the apartment
was too hot for her to stay.  L.H. was
dressed in a sleeper with the hands and feet enclosed.  Cedillo stated that, after she examined L.H.
and noted that he had cigarette burns on his arms, a diaper rash on his
buttocks going up the side of his stomach and part of his leg, and rashes under
his armpits, she took L.H. to the Hopkins County Memorial Hospital emergency
room.  Christina and Higar were also
present, and Jeremy arrived later.

            Cedillo
was troubled regarding Christina’s and Jeremy’s lack of concern for the child
in the hospital emergency room and lack of proper feeding.  Cedillo stated that, while they were waiting
for L.H. to be examined, Christina and Jeremy went outside, ordered pizza, and
smoked cigarettes while she and the CASA worker watched the baby.  When the parents were inside the hospital,
Higar primarily cared for L.H. Christina appeared to be very hesitant to
nurture the baby when he began crying. 
Cedillo observed Higar feed L.H. a bottle and found it unusual that the
baby ate approximately sixteen to twenty ounces during the four to five hours
they were in the waiting room.  When
asked how L.H. received the cigarette burns, Christina gave at least four
inconsistent stories.  At the apartment,
Christina said that they were moving, L.H. screamed, and when she checked on
him, she found red, seeping blisters.  To
the emergency room doctor, Christina stated that they were driving to her
mother’s house with her mother in the back seat while she and Jeremy were in
the front seat.  When L.H. began
screaming, she “jumped” back to look and discovered seeping blisters.  Cedillo stated that the emergency room
physician could not determine whether the burns were accidental or intentional
and that they were possibly consistent with Christina’s second version of the
incident.  According to Cedillo,
Christina gave two additional versions of how the burns occurred, with one
version having her mother in the back seat smoking and another version having
just Christina and Jeremy in the car. 
The inconsistent stories concerned Cedillo.  She found that there was “reason to believe”
the allegations based upon the doctor’s examination and decided to remove
L.H.  She believed that the siblings’
being in foster care contributed to the decision to remove L.H, but other
factors for removing him included the age of the child, cigarette burns to his
arm, a diaper rash that was severe enough to reach his stomach, and issues with
feeding patterns. 

            Sherry
Johnson, a CASA worker, observed L.H. when they left the apartment and went to
the hospital.  According to Johnson, L.H.
was dirty and had a very wet diaper and burn marks.  According to Johnson, the parents did “nothing”
to care for the child in the emergency room. 
The parents ordered pizza, ate it in the hall, and went outside to
smoke. She remembered that Higar fed L.H. about sixteen ounces of formula and
that the baby was throwing up from the amount of formula. 

            Dr.
David Patterson, an emergency room physician at Hopkins County Memorial
Hospital, came in contact with L.H. on October 22, 2004.  According to Patterson, L.H. had a “pretty
bad” diaper rash and several burns on his right arm that he believed were
cigarette burns. He estimated that the burns were one to two weeks old and
seemed to result from a cigarette laying sideways against the child, in direct
contact, for more than a moment because one of the burns was deeper than the
others.  Patterson believed that the
cigarette had to have fallen on L.H. or been placed there.  He was concerned because the child was in
proximity to a cigarette where he could be burned, that medical care was not
sought when the burns occurred, and that the cigarette appeared to have been in
contact with the child more than momentarily. 
When he asked Christina how much formula L.H. took, Christina stated
that he had one to two eight-ounce bottles four to five times a day.  In Patterson’s opinion, that was not
possible,  and he believed that her
answer was consistent with the answer of someone who had not been the child’s
caregiver.  Higar testified that she had
known Christina and Jeremy for approximately two weeks, that the Department was
involved in a case with her youngest child, and that Christina was aware of the
situation with her children. As far as the temperature in the apartment, Higar
stated that it was fine.

            When
the Department investigated L.H.’s burns, Christina admitted that she was out
of town moving her mother, that Jeremy was working, and that L.H. was being
cared for by Higar.  She testified that
she had known Higar a couple of months and that she knew Higar’s children lived
with their father.  Christina stated that
she had no personal knowledge that Higar’s children were removed to foster
care.  However, she admitted that she had
little insight into whether Higar could care for L.H. Christina admitted that
L.H. had a diaper rash, but said she was treating it.  While at the emergency room, she asked a
friend to bring her something to eat. 
Christina testified that she was holding L.H. and trying to change his
outfit because he spit up.  According to
Christina, both the CASA worker and the Department investigator asked if they
could hold L.H. while she went outside and ate.

            Viewing
the evidence in the light most favorable to the finding, a reasonable fact
finder could have concluded that Christina and Jeremy were unable to prevent
L.H. from being burned by cigarettes and that they left him in the care of
Higar who they knew was unable to care for her own children.  While L.H. was in Higar’s care, the apartment
was extremely hot and the baby was in obvious distress.  The jury could have determined that Christina
and Jeremy evidenced no care or concern for L.H. while in the emergency room,
that Christina’s accounts of the burns were contradictory and thus not
believable, and that Christina did not know how to properly and adequately feed
L.H.  Along with previous testimony
regarding the lack of concern shown for their other two children, the jury
could have determined that Christina and Jeremy had engaged in a voluntary, deliberate,
and conscious “course of conduct.”  See
In re D.M., 58 S.W.3d at 812; In re D.T., 34 S.W.3d at
634.  Therefore, we conclude that the
evidence, viewed in the light most favorable to the finding, was sufficiently
clear and convincing that a reasonable trier of fact could have formed a firm
belief or conviction that Christina and Jeremy engaged in conduct or knowingly
placed L.H. with persons who engaged in conduct which endangered his physical
or emotional well being.  See Tex. Fam. Code Ann. § 161.001(1)(E).

            Although
there is conflicting evidence of how L.H. was burned by a cigarette, the jury
could have resolved this conflict in favor of its finding.  Although there is some disputed evidence,
this evidence is not so significant that a reasonable trier of fact could not
have reconciled this evidence in favor of its finding and formed a firm belief
or conviction that Christina and Jeremy engaged in conduct or knowingly placed
L.H. with persons who engaged in conduct which endangered his physical or
emotional well being.  See Tex. Fam. Code Ann. §
161.001(1)(E).  Accordingly, that portion
of Christina’s and Jeremy’s second issue regarding L.H. is overruled.[7]

 

Best Interest of the Child

            We
now turn to the jury’s finding that termination is in the best interest of the
children.  As part of their second issue,
Jeremy and Christina argue that there is not clear and convincing evidence that
termination is in the children’s best interest. 

            In
determining the best interest of the child, a number of factors have been
considered, including (1) the desires of the child; (2) the emotional and
physical needs of the child now and in the future; (3) the emotional and
physical danger to the child now and in the future; (4) the parental abilities
of the individuals seeking custody; (5) the programs available to assist these
individuals; (6) the plans for the child by these individuals; (7) the
stability of the home; (8) the acts or omissions of the parent that may
indicate the existing parent-child relationship is not a proper one; and (9)
any excuse for the acts or omissions of the parent.  Holley v. Adams, 544 S.W.2d
367, 371-72 (Tex. 1976).

            This
list is not exhaustive, but simply indicates considerations that have been or
could be pertinent.  Id.  However, the best interest of the child does
not require proof of any unique set of factors nor limit proof to any specific
factors.  In re D.M., 58
S.W.3d at 814.  The Holley
test focuses on the best interest of the child, not the parent’s best
interest.  Dupree v. Texas Dep’t of
Protective & Regulatory Servs., 907 S.W.2d 81, 86 (Tex. App.–Dallas
1995, no writ).  We  consider the Holley factors
below and examine the evidence not previously described.

The desires of the children

            The
children were too young to testify regarding their desires.  K.H.1 did exhibit some bonding at one time
with Christina, but Durham, Brooks, and Mannon agreed that the parents were
minimally bonded to the children, if at all.

The emotional and physical needs of
the children now and in the future

            Brooks
stated that K.H.1 had adjustment disorder with anxiety that was caused, in
part, by the visitation schedule and possible neglect in the parents’
home.  According to Brooks, K.H.1
exhibited trouble sleeping, and she noted that lack of sleep contributed to
K.H.1's disorder because of her inability to relax and feel comfortable in her
parents’ home and care.  Further, Brooks
stated that, if the parents could not pay the rent, it would be more difficult
for the parents to meet the needs of the children. 

The emotional and physical danger to
the children now and in the future

            Regarding
the lack of attachment between the children and their parents, Brooks testified
that if the children were returned and the parents did not have the skills
leading to improved attachment, the children could be harmed. Gerald Shore,
Ph.D. conducted a psychological evaluation of Christina and Jeremy. Shore
stated that, if the parents could not provide adequate and consistent income,
stable housing, reliable transportation, or sufficient income to supply the
daily provisions to developing children, then it did not sound as though the
parents could or would care for their children. 

The parental abilities of the parents
seeking custody

            The
evidence previously introduced showed that the parents demonstrated minimal
ability to parent, according to the Department, CASA workers, and
counselors.  However, Christina stated
that she loved her children.  Shore
testified that Christina exhibited schizoid and self-defeating traits.  He stated that, despite the fact that
Christina was very intelligent, she did not make decisions that were in her or
her children’s best interest.  Shore found
Christina to be extraordinarily defensive, more than anyone he had ever
seen.  However, Shore stated that
Christina was intelligent enough to benefit from counseling and make different
decisions.  Shore testified that
Christina’s appropriate expectation of children’s developmental strengths and
weaknesses was marginal.  All other
measures were acceptable, and over twenty percent of Christina’s answers
suggested a lack of knowledge that could be corrected with parental training. 

            According
to Shore, Jeremy’s scores were all marginal in the adult adolescent parenting
inventory indicating a need for parenting education and training.  Shore stated that half of Jeremy’s remarks
indicated that he had no particular opinion and, comparing the rest of his
responses, indicated that he was afraid to express an opinion.  Shore stated that, on the child abuse
potential inventory, Jeremy was not lying, but making socially desirable
answers indicating his level of defensiveness. 
Shore stated that Jeremy was defensive and unwilling to commit himself
and, thus, unwilling to change or accept good advice from others. 

The programs available to assist the
parents

            Christina
and Jeremy were offered and completed parenting classes, counseling services,
transportation to visitations, homemaking services, and employment
services.  Even though they took
advantage of most of these programs, Durham, Brooks, and Mannon stated that the
parents failed to demonstrate any of the skills they learned in these programs.


The plans for the children by the
parents

            Christina
testified that Jeremy had talked to his employer about a full time job.  His supervisor stated that he would recommend
Jeremy for a full time position when one was available. During trial, Christina
stated that she obtained two babysitting jobs beginning the next week.  She admitted that the family might need
additional counseling if the children were returned because the children had
been gone so long.

The stability of the home

            Christina
admitted that she and Jeremy were evicted from one home and received an
eviction notice for their current home immediately before trial.  The evictions seemed to be the result of
nonpayment of rent.  The parents seemed
to need continuous financial help from a church or their attorney to stay in an
apartment or get a new one.








The acts or omissions of the parents
that may indicate the existing parent-child relationship is not a proper one

            Officer
Lynnwood Fox, II, a patrol officer with the Sulphur Springs Police Department,
testified that he received a domestic family disturbance call concerning
Christina and Jeremy at  approximately
1:59 p.m. on June 11, 2003.  Upon
arriving at Christina and Jeremy’s apartment, he found Jeremy, Christina’s
sister Melissa McBride, K.H.1, K.H.2, and another child in the apartment.[8]  Fox spoke to Melissa and Jeremy separately
and stated that they recounted a similar story. 
Jeremy told Fox that Christina became upset with him because he wanted
to go to the store with Melissa and that the conversation turned into an argument.  According to Fox, Jeremy stated that
Christina pushed him, that K.H.1 was behind him, and that he stepped on K.H.1's
finger.  Jeremy told Fox that, at this
point, Melissa stepped between the couple and began arguing with Christina.
According to Fox, Jeremy stated that Christina pushed K.H.1 to the ground and
stepped on her.  Fox testified that he
asked Jeremy if Christina saw K.H.1 and Jeremy stated that Christina was
looking at K.H.1 as she stepped on her. 
Based on that comment, Fox believed that Christina intentionally pushed
K.H.1 down and stepped on her.  Regarding
the children, Fox testified that K.H.1 had bites all over her body, a severe
diaper rash including discoloration and a rash on her buttocks, a brown quarter
sized bruise on her cheek, redness and swelling around her right eye, and a
scratch that extended from the corner of her right eye to her cheek, about one
inch in length.  Christina told Fox that
the bruising occurred when K.H.1 hit a coffee table.  Fox stated that the bruise was darker and
possibly older, but that some of the injuries looked “fresh.”  Because of the allegations that K.H.1 was
allegedly intentionally struck and K.H.1 had visible injuries,  Fox contacted the Department.  Fox stated that charges of injury to a child
were subsequently filed against Christina. 

            White
testified that the Department received a report alleging physical abuse,
neglectful supervision, and physical neglect based upon an incident of domestic
violence.  In response, she met with Fox,
both parents, and both children at the Sulphur Springs Police Department.  Both parents told White that they had a fight
on whether they were going to separate and that, during the fight, both of them
stepped on K.H.1. According to White, K.H.1 had bruising to her face on both
cheeks, a scrape mark near her right eye, and dirty clothing.  She stated that both children were taken to
Hopkins County Memorial Hospital. K.H.1 had impetigo, bite marks, and rashes on
her legs, and both children suffered from diaper rash. Because she did not
believe that K.H.1 could protect herself against her parents if they were
fighting in the home, White placed the children with a maternal aunt.  Christina and Jeremy admitted to her that
there had been four to six incidents of domestic violence between them in the
past.  White stated that the Department
had to place the children in foster care on July 29 because Christina had
discussed removing her children from the maternal aunt’s home.  White also stated that, at the close of her
investigation, the allegations of neglectful supervision were validated for
both parents for domestic violence with the children present. However, the
allegations of physical abuse of K.H.2 were “ruled out,” and allegations of
physical abuse of K.H.1 were found “unable to determine” because the injury was
alleged to have occurred before this incident.

            Christina
stated that, during the June 11, 2003 incident, her sister pushed her, causing
her to bump into K.H.1 and accidentally step on her after tripping over a
toy.  Christina explained that the burns
on L.H.’s arm were the result of either her or her mother’s ashes being flicked
out of the car and hitting L.H. on the arm. 
Shore testified that Christina would not take any responsibility for her
children being in foster care.  Durham
stated that neither parent took responsibility for the June 11, 2003
accident. 

Any excuse for the acts or omissions
of the parents

            Christina
testified that she did not see K.H.1 from July 29 to September 11, 2003 and
that K.H.2 was only eleven days old when she was removed.  Brooks admitted that increased hours of
visitation between the parents and the children could improve the relationship
between K.H.1 and Christina.  She stated
that it would be difficult to attach to a newborn child if the parent only
visited her in the Department’s office. 
Brooks admitted that the lack of hours Christina and Jeremy spent with
the children could cause problems with attachment. 

            Durham,
Mannon, and Watkins believed it was in the children’s best interest for the
parents’ rights to be terminated. 
Although there is conflicting testimony regarding Christina’s and Jeremy’s
ability to care for the children financially, the jury could have disregarded
Christina’s testimony that she would be able to babysit six additional
children.  The jury could have also
disregarded testimony that Christina and Jeremy could have bonded or attached
if they spent more time with the children. 
Although there was some disputed evidence, this evidence was not so
significant that a reasonable trier of fact could not have reconciled this
evidence in favor of its finding and formed a firm belief or conviction that
terminating Christina’s parental rights was in the best interest of K.H.1,
K.H.2, and L.H. and that terminating Jeremy’s parental rights was in the best
interest of K.H.2 and L.H.  See Tex. Fam. Code Ann. § 161.001(2).  Accordingly, that portion of Christina’s and
Jeremy’s second issue regarding the children’s best interest is overruled.

 

Disposition

            Having
overruled the two issues presented by Christina and Jeremy in this appeal, the
judgment of the trial court is affirmed.

 

                                                                                                     JAMES T. WORTHEN    

                                                                                                                 Chief Justice

 

 

Opinion delivered November 8, 2006.

Panel consisted
of Worthen, C.J., Griffith, J., and Hoyle, J.

 

 

 

 

 

 

 

 

 

                

 

 

 

 

 

(PUBLISH)











[1] We note that Jeremy’s name sometimes appears
in the record as “Jermey.”





[2] The middle initials for the two older children
are the same.  For purposes of distinguishing
the two, we will refer to the older child as K.H.1 and the younger child as
K.H.2.





[3] On July 18, 2005, Michael signed an unrevoked
or irrevocable affidavit of relinquishment of parental rights.  Accordingly, on July 19, the trial court
ordered that the parent–child relationship between K.H.1 and Michael be
terminated.  Michael is not party to this
appeal.  In this opinion, we frequently
refer to the “parents.” The “parents” are Christina and Jeremy, specifically
Christina in relation to all three children and Jeremy in relation to the two
younger children.





[4] No family service plan was included in the
clerk’s record or offered as evidence in the trial regarding L.H. Consequently,
we do not discuss the termination of Christina’s and Jeremy’s parental rights
to L.H. in this section. 





[5] Lisa LaFever had a bachelor’s degree in social
work and sociology with an emphasis in criminology.  She worked for Family Focus, which had a
contract with the Department to provide homemaking services for Christina and
Jeremy.  She was assigned to work with
them on nutrition and cooking, budgeting, stress management, home safety, time
management, child development, behavioral management, parent-child
relationships, and child care.





[6] Under section 161.001, the Department was
required to prove only one ground of termination under subsection (1).  Because we have held that there was legally
and factually sufficient evidence to support the trial court’s findings under
subsection (1)(O), we need not address the sufficiency of the evidence to
support the trial court’s findings under subsections (1)(D) or (1)(E).





[7] Under section 161.001, the Department was
required to prove only one ground of termination under subsection (1).  Because we have found that there was legally
and factually sufficient evidence to support the trial court’s findings under
subsection (1)(E), we need not address the sufficiency of the evidence to
support the trial court’s findings under subsections (1)(D) or (1)(O).





[8] This incident was prior to L.H.’s birth.