# NO. 12-12-00402-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *IN THE INTEREST OF* | § | *APPEAL FROM THE 123RD* |
| *S.B. AND T.B., JR.,* | § | *JUDICIAL DISTRICT COURT* |
| *CHILDREN* | § | *SHELBY COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

K.B. and T.B. appeal the termination of their parental rights. In three issues, K.B. and T.B. challenge the sufficiency of the evidence to support the order of termination. We affirm.

### BACKGROUND

K.B. and T.B. are the parents of two children, S.B., born January 6, 2010, and T.B., Jr., born April 18, 2011. On September 12, 2011, the Department of Family and Protective Services (the "Department") filed an original petition for protection of the children, for conservatorship, and for termination of K.B. and T.B.'s parental rights. The Department was appointed the children's temporary managing conservator, and K.B. and T.B. were appointed temporary possessory conservators with limited access to and possession of the children.

The case proceeded to trial on June 12, 2012, before the associate judge of the district court of Shelby County, Texas. After the trial concluded, the associate judge found, by clear and convincing evidence, that K.B. and T.B. had engaged in one or more of the acts or omissions necessary to support termination of their parental rights under Texas Family Code Section 161.001(1), and that termination of the parent-child relationship between K.B., T.B., and the children was in the children's best interest. Based upon these findings, the associate judge ordered that the parent-child relationship between K.B., T.B., and the children be terminated.

1

On June 20, 2012, K.B. and T.B. filed a request for a de novo hearing before the district court of Shelby County, Texas. The trial de novo proceeded on October 12, 2012. At the hearing, the certified transcript of the prior trial was offered and admitted into evidence. After the conclusion of the trial, the trial court found, by clear and convincing evidence, that K.B. and T.B. had engaged in one or more of the acts or omissions necessary to support termination of their parental rights under Section 161.001(1), subsections (D), (E), and (O). The trial court also found that termination of the parent-child relationship between K.B., T.B., and the children was in the children's best interest. Accordingly, the trial court ordered that the parent-child relationship between K.B., T.B., and the children be terminated. This appeal followed.

## TERMINATION OF PARENTAL RIGHTS

Involuntary termination of parental rights embodies fundamental constitutional rights. *Vela v. Marywood*, 17 S.W.3d 750, 759 (Tex. App.—Austin 2000), *pet. denied per curiam*, 53 S.W.3d 684 (Tex. 2001); *In re J.J.*, 911 S.W.2d 437, 439 (Tex. App.—Texarkana 1995, writ denied). Because a termination action permanently sunders the bonds between a parent and child, the proceedings must be strictly scrutinized. *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976); *In re Shaw*, 966 S.W.2d 174, 179 (Tex. App.–el Paso 1998, no pet.).

Section 161.001 of the family code permits a court to order termination of parental rights if two elements are established. TEX. FAM. CODE ANN. § 161.001 (West Supp. 2012); *In re J.M.T.*, 39 S.W.3d 234, 237 (Tex. App.—Waco 1999, no pet.). First, the parent must have engaged in any one of the acts or omissions itemized in the first subsection of the statute. TEX. FAM. CODE ANN. § 161.001(1) (West Supp. 2012); *Green v. Texas Dep't of Protective & Regulatory Servs.*, 25 S.W.3d 213, 219 (Tex. App.—El Paso 2000, no pet.); *In re J.M.T.*, 39 S.W.3d at 237. Second, termination must be in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(2) (West Supp. 2012); *In re J.M.T.*, 39 S.W.3d at 237. Additionally, both elements must be established by clear and convincing evidence, and proof of one element does not alleviate the petitioner's burden of proving the other. TEX. FAM. CODE ANN. § 161.001; *Wiley*, 543 S.W.2d at 351; *In re J.M.T.*, 39 S.W.3d at 237.

Due process requires a petitioner to justify termination by clear and convincing evidence because termination is such a drastic remedy. *In re J.M.T.*, 39 S.W.3d at 238. The clear and convincing standard for termination of parental rights is both constitutionally and statutorily

mandated. TEX. FAM. CODE ANN. § 161.001; *In re J.J.*, 911 S.W.2d at 439. Clear and convincing evidence means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. TEX. FAM. CODE ANN. § 101.007 (West 2008). There is a strong presumption that the best interest of the child is served by preserving the parent-child relationship. *Wiley*, 543 S.W.2d at 352; *In re J.M.T.*, 39 S.W.3d at 240. Thus, the burden of proof is upon the person seeking to deprive the parent of their parental rights. *In re J.M.T.*, 39 S.W.3d at 240.

## STANDARD OF REVIEW

When confronted with both a legal and a factual sufficiency challenge, an appellate court must first review the legal sufficiency of the evidence. *Glover v. Texas Gen. Indem. Co.*, 619 S.W.2d 400, 401 (Tex. 1981); *In re M.D.S.*, 1 S.W.3d 190, 197 (Tex. App.—Amarillo 1999, no pet.). In conducting a legal sufficiency review, we must look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its findings were true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We must assume that the fact finder settled disputed facts in favor of its finding if a reasonable fact finder could do so and disregard all evidence that a reasonable fact finder could have disbelieved or found incredible. *Id.*

The appropriate standard for reviewing a factual sufficiency challenge to the termination findings is whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth of the petitioner's allegations. *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). In determining whether the fact finder has met this standard, an appellate court considers all the evidence in the record, both that in support of and contrary to the trial court's findings. *Id.* at 27-29. Further, an appellate court should consider whether disputed evidence is such that a reasonable fact finder could not have reconciled that disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266.

This standard retains the deference an appellate court must have for the fact finder's role. *In re C.H.*, 89 S.W.3d at 26. Additionally, the trier of fact is the exclusive judge of the credibility of the witnesses and the weight to be given their testimony. *Nordstrom v. Nordstrom*, 965 S.W.2d 575, 580 (Tex. App.—Houston [1st Dist.] 1997, pet. denied). Thus, our review must

not be so rigorous that only fact findings established beyond a reasonable doubt could withstand review.  *In re C.H.*, 89 S.W.3d at 26.

**TERMINATION UNDER SECTION 161.001(1)(E)**

In their second issue, K.B. and T.B. argue that the evidence is legally and factually insufficient to support a finding that they engaged in conduct or knowingly placed S.B. and T.B., Jr. with persons who engaged in conduct that endangered the children's physical or emotional well being.

## Applicable Law

Section 161.001(1)(E) of the Texas Family Code states that the court may order termination of the parent-child relationship if the court finds by clear and convincing evidence that the parent has engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangers the physical or emotional well being of the child.  TEX. FAM. CODE ANN. § 161.001(1)(E) (West Supp. 2012).  The specific danger to the child's well being need not be established as an independent proposition, but may instead be inferred from parental misconduct.  *Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re J.J.*, 911 S.W.2d at 440.  Further, scienter is not required for an appellant's own acts under Section 161.001(1)(E), although it is required when a parent places his child with others who engage in endangering acts.  *In re U.P.*, 105 S.W.3d 222, 236 (Tex. App.—Houston [14th Dist.] 2003, pet. denied).  Finally, the need for permanence is a paramount consideration for the child's present and future physical and emotional needs.  *In re N.K.*, 99 S.W.3d 295, 301 n.9 (Tex. App.—Texarkana 2003, no pet.); *In re M.D.S.*, 1 S.W.3d at 200.

"Endanger" means to expose to loss or injury or to jeopardize.  *Boyd*, 727 S.W.2d at 533; *In re D.M.*, 58 S.W.3d 801, 811 (Tex. App.—Fort Worth 2001, no pet.).  It is not necessary that the conduct be directed at the child or that the child actually suffers injury; rather, it is sufficient that the child's well being be jeopardized or exposed to loss or injury.  *Boyd*, 727 S.W.2d at 533; *In re J.J.*, 911 S.W.2d at 440.  Subsection (E) requires us to look at the parent's conduct alone, including actions, omissions, or the parent's failure to act.  *In re D.J.*, 100 S.W.3d 658, 662 (Tex. App.—Dallas 2003, pet. denied); *In re D.M.*, 58 S.W.3d at 811.  It is inconsequential that the parental conduct occurred before the child's birth.  *In re U.P.*, 105 S.W.3d at 229; *In re D.M.*, 58 S.W.3d at 812.  Instead, courts look to what the parent did both before and after the

4

child's birth to determine whether termination is necessary. *In re D.M.*, 58 S.W.3d at 812. Further, termination under subsection (E) must be based on more than a single act or omission. *In re D.M.*, 58 S.W.3d at 812; *In re D.T.*, 34 S.W.3d 625, 634 (Tex. App.—Fort Worth 2000, pet. denied). A voluntary, deliberate, and conscious course of conduct by the parent that endangers the child's physical and emotional well being is required. *In re D.M.*, 58 S.W.3d at 812; *In re D.T.*, 34 S.W.3d at 634.

As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well being of a child. *In re M.R.J.M.*, 280 S.W.3d 494, 503 (Tex. App.—Fort Worth 2009, no pet.); *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). A parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *see also In re R.W.*, 129 S.W.3d at 739. Further, a parent's illegal drug use can support termination for endangerment because it exposes the child to the possibility that the parent may be impaired or imprisoned. *Melton v. Tex. Dep't of Family and Protective Svcs.*, No. 03-08-00168-CV, 2010 WL 668917, at *5 (Tex. App.—Austin Feb. 25, 2010, no pet.) (mem. op.).

Conduct which routinely subjects a child to the probability that he or she will be left alone because the parent is once again jailed, whether because of the continued violation of probationary conditions or because of a new offense growing out of a continued use of illegal drugs, endangers both the physical and emotional well being of a child. *See In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied).

## Analysis

Ron VanWettering, a physical assistant for Shelby Regional Medical Center, Emergency Department, testified that T.B., Jr. was brought to the emergency room in the early afternoon of September 11, 2011. He stated that T.B., Jr., who was four months old, had an altered mental status, ongoing neurological deficit, flexion and extension, uncontrollable arms and legs, rhythmic tongue, and eye rolling. VanWettering testified that K.B. and T.B. explained that T.B., Jr. had just had a seizure. He also testified that K.B. told him that T.B., Jr. had a seizure disorder, but that this seizure was different. He stated that after the initial tests, all of the results were negative, but T.B., Jr. was still suffering from very variable blood pressure, respiration, and pulse. VanWettering stated that, at that point, T.B., Jr. was transferred to the pediatric intensive

5

care unit at Willis Knighton Pierremont Health System in Shreveport, Louisiana. He stated that T.B., Jr. was suffering from serious medical problems.

VanWettering testified that approximately six hours later, S.B., who was twenty-one months old, arrived at the emergency room with the same symptoms, including altered mental status, inability to be roused, rhythmic reflection extending into the arms and legs, tongue darting, and uncontrollable eye rolling. He also believed that S.B. was suffering from serious medical problems. VanWettering testified that he conducted the same initial tests but also ordered a urine toxicology screen. He stated that S.B.'s urine was positive for phencyclidine or PCP, a very powerful illegal drug. At that point, VanWettering notified the physician in Shreveport to report the results of the toxicology screen, and discovered that T.B., Jr.'s toxicology screen was also positive for PCP. Based on his observations, Van Wettering believed that both children were exposed to PCP and that this drug caused their symptoms.

Lindsay Button, an employee with the Department, testified that drug tests from the Texas Alcohol and Drug Testing Service showed positive drug test results for K.B., T.B., S.B., and K.K. as follows:

| Date | | Test | Results |
|------|------|------|---------|
| 01/17/12 | K.B. | hair follicle | cocaine |
| 03/09/12 | K.B. | hair follicle | cocaine |
| | | | |
| 09/15/11 | T.B. | hair follicle | PCP and marijuana |
| 09/15/11 | T.B. | urinalysis | PCP and marijuana |
| 10/13/11 | T.B. | urinalysis | PCP |
| 01/09/12 | T.B. | hair follicle | PCP and cocaine |
| 04/18/12 | T.B. | hair follicle | PCP, cocaine, and codeine |
| | | | |
| 11/03/11 | S.B. | hair follicle | cocaine |
| | | | |
| 09/15/11 | K.K. | hair follicle | PCP, codeine, and marijuana |
| 09/15/11 | K.K. | urinalysis | PCP and marijuana |

Button also testified that K.B. had several negative drug tests, and T.B. had two negative urinalysis drug tests. She stated that the children were removed on September 11, 2011, after the parents brought them to the emergency room for seizures and both children tested positive for PCP. At the beginning of the case, Button explained, the goal of the family plan was family reunification. However, she testified, because K.B. and T.B. continued to test positive for drugs and failed to complete services, the Department's plan changed to termination of parental rights.

6

According to Button, neither parent completed the family service plan because they continued to use illegal drugs and did not complete an alcohol and drug assessment. She admitted that no PCP was found in K.K.'s home or on K.B., T.B, or K.K. Button believed it was in the best interest of the children for K.B. and T.B.'s parental rights to be terminated.

K.K., who was T.B.'s paramour of approximately thirty years, testified that both children were living with her on September 11, 2011, and that she was their main caregiver. She stated that S.B. began living with her when the child was approximately two weeks old and that T.B., Jr. began living with her soon after he was born. According to K.K., the children's mother, K.B., did not live with her, but saw the children every day. She testified that T.B. spent a "lot[] of nights" with her, but lived "mostly" with K.B.

K.K. testified that the week before September 11, 2011, S.B. and T.B., Jr. suffered from congestion and colds, and she had been treating them with children's cold medicine. She stated that on the morning of September 11, K.B. and T.B. arrived around eight o'clock in the morning. She stated that she gave the children a dose of the cold medicine, and fed them breakfast, but testified that neither child really wanted a bottle. K.K. testified that K.B. and T.B. were playing with the children when she attempted to give T.B., Jr. his bottle. She stated that T.B., Jr. drank a little of his bottle, spit up, and began to exhibit signs of a seizure. K.K. called an ambulance, and the ambulance took T.B., Jr. and his parents to the hospital.

According to K.K., she and the older child, S.B., were at the house with one of T.B.'s granddaughters after T.B., Jr. went to the hospital. At one point, she testified, she laid S.B. down and noticed that she was acting "really sleepy," but did not seem to want to go to sleep. K.K. testified that S.B. appeared to be "out of it" approximately one to two hours later, and so she stopped a deputy sheriff to take S.B. to the emergency room. K.K. testified that she had seen T.B. use PCP once or twice before the children began living with her. She also stated that she saw him using PCP "mostly at [her] house." Although she could not recall T.B.'s using marijuana, cocaine, or any other illegal substance, she admitted that she had used marijuana in the past. According to K.K., there was no PCP in her house. She also stated that T.B. "never smoked [marijuana] around [her] that much." She admitted that K.B. had psychological problems and drank. K.K. also admitted that she might have told someone that K.B. was not capable of taking care of the children.

K.B. testified that her children lived with K.K. on September 11, 2011, and that S.B. began living with K.K. when she was approximately two months old. She stated that she lived in a house owned by T.B. and that he sometimes lived with her and sometimes with K.K. K.B. testified that on September 11, 2011, she went to K.K.'s house to see her children. She was playing with T.B., Jr. when he began to be restless, as if he was sleepy. K.B. stated that she gave him a bottle, burped him, changed his diaper, and rocked him to sleep. She testified that T.B., Jr. slept about two hours and woke up with his eyes rolling back in his head. According to K.B., T.B., Jr. was shaking as if he was having a seizure. At that point, she stated, the family called an ambulance to take them to the emergency room.

K.B. explained that T.B.'s house was not large enough for her daughter and son because it had only two bedrooms and she could not put children of the opposite sex in the same bed. She testified that she and T.B. were attempting to remodel the house beginning in August 2012. She stated that she was planning on renting a three bedroom apartment with T.B. while the house was being remodeled. However, K.B. also mentioned getting a house through Habitat for Humanity, but having to wait a "couple of years." She also stated that the court-ordered counselor, James Calloway, laughed in her face and told her that she was not getting her children back.

K.B. admitted that she suffered from seizures. Although she denied using PCP, cocaine, or any other drugs, she admitted drinking on special occasions. She testified that she had "no clue" how the children might have been exposed to PCP. She denied having anything to do with the children ingesting PCP and did not know anything that would have made her believe that her children were in danger by living with K.K. She stated that she had never seen T.B. use marijuana, cocaine, or PCP, nor was she aware that T.B. had ever used PCP. She could not explain how both she and T.B. tested positive for drugs. K.B. denied going to counseling when she was intoxicated, but admitted that she had taken her medicine, which led the counselor to believe she had been drinking. She admitted taking Lithium, Wellbutrin, Dilantin, and Risperdal for asthma and "mental" problems.

T.B. testified that on September 11, 2011, the children lived with K.K., but that he and K.B. did not. He admitted having stents in his heart, four strokes, and three heart attacks. At the time of the first trial, T.B. testified that he had been diagnosed with lung cancer, and had three cancerous tumors in his left lung. At that time, he was undergoing chemotherapy and radiation.

8

At the trial de novo, T.B. stated that his cancer remained. He also stated that he was scheduled to undergo a CAT scan, and had an appointment to determine his next course of treatment. He was also on numerous medications for his heart, cholesterol, blood pressure, and stomach including Naproxen, Aricept, Clonidine, Isordil, Simvastatin, Norvasc, an antacid, Meloxican, Metronidazole, Nexium, Nitroxstat, Tylenol codeine, Phenergan, Cephalexin, Amiodarone, and antibiotics.

T.B. testified that K.K.'s account of the morning and afternoon of September 11, 2011, was accurate. He explained that on that morning, K.K. made the children's bottles. He testified that the children did not eat or drink anything other than their bottle that morning. T.B. stated that his future plans were to move into a larger house because his current house was too small. He stated that the second bedroom is merely an "add-on," and he did not believe it was fair to put children of the opposite sex in one room. As such, T.B. testified, "they" are going to build him a new house, referring to a "citizen ordeal" that will build houses on land with a clear title. He stated that he has produced a clear title and is on the "docket" for getting a new house.

T.B. testified that his court-ordered counseling with James Calloway was a failure because Calloway came to him "like an outlaw." According to T.B., Calloway laughed and said that he, T.B., would "never get these children. I don't care what you say. I don't care how you do it." T.B. stated that Calloway also said that neither K.B. nor K.K. would get the children back. T.B. believed that his parental rights should not be terminated because the children are his, given to him by "[the Lord] to love." He testified that he played with the children, carried them, changed their diapers, and fed them. He would make sure that this would not happen again if his children were returned to him.

T.B. admitted using PCP before the children were born, but denied using marijuana, cocaine, or any other illegal drug because he had heart problems. He testified that he has been warned that if he mixed illegal drugs with his medications, it could kill him. He also denied using PCP since he started taking the drugs listed above. T.B. admitted that he had used PCP in K.K.'s house—the house where the children were living when they had seizures—and that K.K. used PCP before the children began living with her. He was not aware that K.K. tested positive for PCP on September 15, 2011, nor did he know that she was using PCP. T.B. had no idea how the children were exposed to PCP because he stated that there was no PCP in the house and he

9

did not see anyone give the children PCP. Nonetheless, T.B. admitted that after September 11, 2011, he tested positive for PCP. However, he could not understand how it occurred.

James Calloway, a licensed professional counselor, testified that he counseled T.B. regarding the children. He testified that his primary concern was that no one he counseled could explain to him how the children were exposed to PCP. He stated that the focus of his counseling was to determine if the children would be safe returning to K.B. and T.B. In order for him to come to a decision, he needed to, first, determine how the children were exposed to PCP. Then, Calloway explained, he and the parents could address steps to resolve the situation. However, he was unable to do so because K.B. and T.B. did not know how the children were exposed to PCP, even while the parents were testing positive for drugs. Thus, he could not support the children being returned to their parents. According to Calloway, T.B. blamed K.B. or K.K. for exposing the children to drugs and stated that K.B. was not able to care for the children. Calloway testified that while counseling T.B. at his house, T.B. had a pistol in the room, and that K.B. appeared to be intoxicated at one session. In Calloway's opinion, it was not in the children's best interest to be returned to K.B. and T.B.

Leroy Newman, appointed as the CASA guardian ad litem for the children, recommended that K.B. and T.B.'s parental rights to the children be terminated, and stated that this recommendation was in the children's best interest. Newman testified that his recommendation was based on the fact that the children were exposed to PCP, the parents did not complete the service plan, the parent continued to test positive for drugs, and subsequently, the environment was unsafe for the children. Further, he noted that T.B. was in poor health, and K.B. was unable to care for the children herself. He also testified that all the Department's caseworkers for the children, counselors, and emergency room doctors all believed that the children should not be returned to K.B. and T.B. He stated that the children are in a possible adoptive home.

**Conclusion**

Viewing the evidence in the light most favorable to the finding, the trial court could have determined that T.B. tested positive for PCP directly after the children suffered seizures caused by ingesting PCP; that their caregiver, K.K., also tested positive for PCP directly after the children were hospitalized for ingesting PCP; that T.B. used PCP in the past in the home where the children were living when they ingested PCP; that K.B. and T.B. continually tested positive for drugs after the children were removed; and that K.K., K.B., and T.B. did not know how the

10

children ingested PCP even though K.K. and T.B. tested positive for PCP. Further, the trial court could have concluded that K.B. and T.B.'s housing plans for the children were vague and tenuous; that K.B. could not take care of the children herself; and that this unstable home life subjected the children to a life of uncertainty and instability. *See In re M.R.J.M.*, 280 S.W.3d at 503.

Although there is evidence that conflicts with the trial court's findings, including that K.B. testified that she did not know that T.B. used drugs or that the children would be in danger living with K.K., the trial court could have resolved this conflict in favor of its finding. Although there is some disputed evidence, this evidence is not so significant that a reasonable trier of fact could not have reconciled this evidence in favor of its finding and formed a firm belief or conviction that K.B. and T.B. engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well being.

We hold that the evidence is legally and factually sufficient to support termination of K.B. and T.B.'s parental rights under Section 161.001(1)(E). Accordingly, K.B. and T.B.'s second issue regarding Section 161.001(1)(E) is overruled.[1]

## BEST INTEREST OF THE CHILDREN

In their third issue, K.B. and T.B. argue that the evidence is legally and factually insufficient to support a finding that termination of their parental rights was in the best interest of the children. In determining the best interest of the child, a number of factors have been considered, including (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals; (6) the plans for the child by these individuals; (7) the stability of the home; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976).

---

[1] Under Section 161.001, the Department was required to prove only one ground of termination under subsection (1). Because we have concluded that the evidence is legally and factually sufficient to support termination of K.B. and T.B.'s parental rights under subsection (1)(E), we need not determine if the trial court's findings under subsections (1)(D) and (1)(O) are also supported by legally and factually sufficient evidence. Therefore, we do not address K.B. and T.B.'s first issue regarding subsection (1)(O) or their second issue regarding subsection (1)(D).

This list is not exhaustive, but simply indicates considerations that have been or could be pertinent.  ***Id.***  However, the best interest of the child does not require proof of any unique set of factors nor limit proof to any specific factors.  ***In re D.M.***, 58 S.W.3d at 814.  The ***Holley*** test focuses on the best interest of the child, not the parent's best interest.  ***Dupree v. Texas Dep't of Protective & Regulatory Servs.***, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ).  We apply the ***Holley*** factors below.

*The desires of the children*

At the time of the trial de novo, S.B. was almost three years old and T.B., Jr. was eighteen months old.  As such, they were too young to express their desires.

*The emotional and physical needs of the children now and in the future*

Newman testified that the children are in a possible adoptive home.  Although K.B. and T.B. stated that their home was in the process of being remodeled, they also stated that they might move into an apartment or have a house built in a few years by a community organization.  Neither parent was clear about the living arrangements for the children.  Further, neither could see the possibility of living with their two children in the current home with two bedrooms.

*The emotional and physical danger to the children now and in the future*

K.K. and T.B. both tested positive for PCP four days after the children suffered seizures from ingesting PCP.  Further, T.B. continued to test positive for PCP, cocaine, codeine, and marijuana, and K.B. tested positive for cocaine after the children were removed.  K.K., K.B., and T.B. could not explain how the children ingested PCP.  Further, K.B. contended that she did not know that K.K. or T.B. used drugs.  Calloway stated that K.B. and T.B. said they did not know how the children were exposed to PCP even though they continued to test positive for drugs.  Further, he stated that K.B. appeared to be intoxicated at one counseling session and may not be able to care for the children herself.

*The parental abilities of the parent seeking custody*

T.B. was in poor general health and also suffered from lung cancer. Calloway testified that T.B. stated that K.B. was not able to take care of the children, and K.K. testified that she may have stated that K.B. could not take care of the children.

*The plans for the children by the parent*

Neither parent testified as to their plans for the children other than possible housing arrangements.

12

*The stability of the home*

On September 11, 2011, both children were living with K.K., not the parents, because K.B. and T.B. believed that their two bedroom home was too small for two children of the opposite sex. However, more than a year later at the trial de novo, the parents did not have a home to offer the children, stating that their house had to be remodeled, or that they might move to an apartment, or have a house built. K.B. and T.B.'s housing plans were tenuous and vague. K.K., K.B., and T.B. could not explain how the children ingested PCP. However, K.K. and T.B. tested positive for PCP four days after the children were hospitalized for seizures caused by ingesting PCP. Further, T.B. continued to test positive for PCP, cocaine, codeine, and marijuana, and K.B. tested positive for cocaine after the children were removed.

*The acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one*

On September 11, 2011, S.B. and T.B., Jr. were taken to the emergency room suffering from seizures. The emergency room physician assistant, VanWettering, testified that both children's toxicology tests were positive for PCP. K.K. and T.B. tested positive for PCP four days after the children suffered seizures from ingesting PCP. Further, T.B. continued to test positive for PCP, cocaine, codeine, and marijuana, and K.B. tested positive for cocaine after the children were removed. However, K.K., K.B., and T.B. could not explain how the children ingested PCP.

T.B. admitted using PCP before the children began living with K.K. and in the house where the children were living. He also stated that K.K. used PCP before the children began living with her. K.K. admitted that T.B. used PCP at her house, and that he also used marijuana.

Viewing the evidence in the light most favorable to the finding, a reasonable fact finder could have concluded that S.B. and T.B., Jr. ingested PCP, that K.K. and T.B. tested positive for PCP four days after the children suffered seizures from PCP, that K.B. and T.B. continued to test positive for drugs after the children were removed, that K.B. and T.B. did not have any explanation as to how the children were exposed to PCP, and that T.B. admitted using PCP in the past in the house where the children were living when they were exposed to PCP. Further, the trial court could have concluded that K.B. and T.B.'s housing plans for the children were vague and tenuous at best, that T.B. was in very poor health, and that K.B. could not take care of the children by herself. Considering all the evidence in relation to the best interest factors in the

13

light most favorable to the court's finding, we conclude a reasonable trier of fact could have formed a firm belief or conviction that termination was in the best interest of the children.

However, K.B. contended that she did not know that T.B. used PCP or any other illegal drugs or that her children were in danger while living with K.K. Although there is some disputed evidence on this question, this evidence is not so significant that a reasonable trier of fact could not have reconciled this evidence in favor of its finding and formed a firm belief or conviction that terminating K.B. and T.B.'s parental rights was in the best interest of the children.

We hold that the evidence is legally and factually sufficient to support the trial court's finding that termination of K.B. and T.B.'s parental rights is in the best interest of the children. Therefore, we overrule K.B. and T.B.'s third issue.

## DISPOSITION

Having overruled K.B. and T.B.'s first, second, and third issues, we *affirm* the judgment of the trial court.

## SAM GRIFFITH
Justice

Opinion delivered May 22, 2013.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*

(PUBLISH)

14



# COURT OF APPEALS
# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS
# JUDGMENT

## MAY 22, 2013

## NO. 12-12-00402-CV

## IN THE INTEREST OF S.B. AND T.B., JR., CHILDREN

---

Appeal from the 123rd Judicial District Court

of Shelby County, Texas. (Tr.Ct.No. 11CV31,714)

---

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that this decision be certified to the court below for observance.

Sam Griffith, Justice.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*